464 So.2d 836 (1985)
Emily Trascher HEINE, Widow of Anton G. Heine, II, Individually and As Natural Tutrix of Her Minor Children, Lori Christine Heine, and Lorna Christine Heine; and Anton G. Heine, Jr.
v.
Amber F. ADAMS, ABC Insurance Company; Kathryn Tyler, XYZ Insurance Company; Eliseo Mikos, ABC Insurance Company; Petroleum Transport Company, Inc., USF & G Insurance Company; and Allstate Insurance Company.
No. 84-CA-318.
Court of Appeal of Louisiana, Fifth Circuit.
February 11, 1985.
Writ Denied April 12, 1985.
Guy W. Olano, Jr., Frank P. Tranchina, Jr., Kenner, for plaintiff-appellant, Emily Thrascher Heine.
C. Scott Carter, Wiedemann & Fransen, New Orleans, for defendant-appellee, Eliseo Mikos, Petroleum Transport Co., Inc. and U.S.F. & G. Co.
Charles W. Schmidt, III, Christovich & Kearney, New Orleans, for defendant-appellee, Interstate Fire & Cas.
*837 Before BOWES, CURRAULT and GAUDIN, JJ.
CURRAULT, Judge.
This appeal originates in the Twenty-Fourth Judicial District Court, Division "A", Parish of Jefferson, wherein the Honorable Roy A. Price rendered judgment dismissing plaintiff's claims pursuant to a jury's finding of no negligence on the part of defendants. We affirm.
As a result of a multi-vehicle accident occurring during the early morning hours of July 23, 1980, Mr. Anton G. Heine, III was killed and his guest passenger, Ms. Amber F. Adams, was severely injured. The Heine pickup truck initially struck a bridge guardrail and was then itself struck by a second automobile driven by Kathryn Tyler. Mr. Heine was thrown into the center lane where he was subsequently run over by a gasoline tanker owned by Petroleum Transport Company and driven by Eliseo Mikos.
A complex lawsuit involving several parties and their insurers ultimately resulted in a lengthy jury trial. At that trial, Mrs. Heine, together with the heirs of Anton G. Heine, III, sought damages against Kathryn Tyler, Eliseo Mikos and Petroleum Transport Company. After eight days and a long parade of witnesses, both factual and expert, the jury returned its verdict finding the three named defendants not negligent. Plaintiffs-appellants have brought this appeal, asserting the following specifications of error:
(1) the trial court erred in failing to instruct the jury as to the appropriate rule of law in cases where the defense of sudden emergency is relied upon; and
(2) the jury erred in finding Petroleum Transport and Eliseo Mikos not negligent.
Appellants argue that because Eliseo Mikos's and Petroleum Transport's liability was negated by the fact that Mr. Mikos was responding to a sudden emergency, the doctrine of sudden emergency should have been carefully explained to the jury. More specifically, appellants complain that because the trial court failed to include a charge explaining that the sudden emergency defense is inapplicable to emergencies precipitated by one's own negligence, the trial court erred grievously. Whittington v. Sowela Technical Institute, 438 So.2d 236 (La.App. 3d Cir.1983), writ denied 443 So.2d 591, 592 (La.1983).
The only charge contained in the record pertaining to the sudden emergency defense reads as follows:
If an object suddenly appears in the path of a motor vehicle traveling at a reasonable rate of speed and the accident occurs before the driver can stop or so maneuver his vehicle so as to avoid striking the object, the accident is unavoidable, and there is no liability on the part of the driver.
In West v. U.S. Fidelity & Guaranty Co., 405 So.2d 877 (La.App. 4th Cir.1981), the court reiterated that a proper charge of all facets of the law involved is essential in order that the rights, liabilities and obligations of all parties concerned may be fairly adjudicated. The court in West, supra, at 879 went on to state:
Where there is question that factual findings are not made pursuant to a clear understanding of the applicable law, the charges will be deemed insufficient or inadequate; and where erroneous charges preclude the jury from reaching a verdict in accordance with the law and facts, the Court of Appeal should render a judgment on the record before it.
The adequacy of a jury instruction, however, must be determined in light of the jury instructions as a whole. Trapani v. State Farm Fire & Cas. Co. 424 So.2d 449 (La.App. 5th Cir.1982).
Accordingly, after reviewing the jury instructions, in toto, we agree with appellants that this charge is incomplete by its failure to include an essential element of the sudden emergency doctrine; that is, the sudden emergency defense is inapplicable where the emergency was precipitated by claimant's own negligence. Further, we agree with appellants that it would have had a prejudicial effect precluding a jury *838 from reaching a verdict based upon the law and facts. With a complete record before us, including all of the necessary evidence, we now undertake an independent evaluation of the facts as if we had the case before us for a trial de novo to adjudicate the controversy completely. Boyette v. Auger Timber Co., 403 So.2d 800 (La.App. 2d Cir.1981). We now must make a factual determination of whether Eliseo Mikos and Petroleum Transport Company were negligent.
The accident in question occurred in the eastbound lanes of I-10, seven-tenths of a mile east of Route 72 (a stretch of I-10 situated north of the Michoud Boulevard exit but south of the twin span bridges crossing Lake Pontchartrain). This particular area is normally dark because there is no lighting; and, on the night in question, visibility was further reduced as it was cloudy. The road surface was level and dry.
As Mr. Heine was proceeding east, his pickup truck struck the protective guardrail of a ground level bridge. His truck spun around and came to a stop in the left lane just at the bridge entrance. Ms. Adams, Heine's guest passenger, had been asleep on the front seat. She awoke in a dazed condition after her head had struck the windshield. Seeing Mr. Heine slumped over the steering wheel, she exited the pickup via the passenger side which was facing oncoming traffic.
Mr. Lester Shoemaker, a supply boat mate, was heading east at 55 MPH in the center lane when he spotted what appeared to be steam coming from a disabled pickup truck stopped ahead of him in the left lane. Simultaneously with spotting the disabled Heine truck, Mr. Shoemaker's vehicle was overtaken and passed on the left by a 1976 Oldsmobile driven by Kathryn Tyler. Shoemaker let off the gas as soon as he saw the Heine vehicle and when he saw the Tyler vehicle was not going to stop, he quickly applied his brakes.
The Tyler vehicle then struck Ms. Adams and collided with the Heine pickup which was propelled fifty feet, but remained in the left lane. The Tyler vehicle came to a stop in the right lane seventy-seven feet from the point of impact with the Heine pickup. As a result of the Tyler/Heine collision, Mr. Heine was thrown into the center lane and Ms. Adams was dragged and pinned beneath the Tyler automobile.
Mr. Shoemaker came to a complete stop in the center lane as the Tyler/Heine collision occurred. Once stopped, he tried to "size up the situation." He immediately looked in his rearview mirror and saw three oncoming trucks. Deciding he could not stay there, Mr. Shoemaker proceeded forward going around Mr. Heine, between Mr. Heine and his pickup truck, and then driving to the end of the bridge where he pulled over to the right off the bridge and behind the bridge abutment. After placing his flashers on, he ran back to where Mr. Heine was lying. Shoemaker testified Mr. Heine was at this point fully clothed, not bleeding, and was moving his right arm in and up-and-down fashion.
Mr. Shoemaker ran back somewhere between the two disabled vehicles waiving his arms up and down. He then realized that the three oncoming trucks were not going to stop. At this point, he yelled a warning to Mrs. Tyler, who had just exited her vehicle, and then ran to the side of the bridge where he prepared himself to jump. When Mr. Shoemaker realized the lead truck was going to proceed through the accident scene and strike Mr. Heine, he turned his head away choosing not to look. Mr. Eliseo Mikos, driving an eighteenwheeler tanker loaded with 8500 gallons of gasoline, then drove through the accident site striking Mr. Heine whose body came to rest one hundred and seventeen feet from the point of impact.
Paul Reamy, President of Transportation Safety Systems, qualified and testified as an expert in the field of federal highway safety regulations. Mr. Reamy was retained solely for the purpose of determining whether or not Eliseo Mikos and/or Petroleum Transportation Company were in complete compliance with the federal motor carrier safety regulations. After reviewing *839 several documents, including those concerning Mr. Mikos's qualifications, Mr. Reamy concluded that Mr. Mikos was not qualified to drive in accordance with the federal motor carrier safety regulations.
Mr. Frank Martineau was qualified and testified as an expert in the field of tachograph [1] analysis and driver profile. It was Mr. Martineau's undisputed opinion that:
(1) the tachograph in the truck Mr. Mikos was driving had been previously tampered with so as to not register greater than 55 MPH; that
(2) the tachograph disc readout for the evening of the accident clearly showed that Mr. Mikos had stopped his truck and opened his locked tachograph at approximately 11:45 p.m., thereby causing it to malfunction for the rest of the shift, including the time of the accident in question; that
(3) it was his experience that the reason tachographs are unlocked and stopped is to cover up the necessary speeding a driver must do in order to make up for lost time usually incurred by a previous or unscheduled stop; and that
(4) the tachograph readout for the night in question did indeed show that Eliseo Mikos had been speeding that night prior to 11:45 p.m.
Although Mr. Mikos testified he did not have a key to this tachograph and did not open it, we find his credibility lacking as he had been reprimanded by Petroleum Transport on a prior occasion for tampering with tachographs. Additionally, Eliseo Mikos, without doubt, lied to the investigating New Orleans police officer, Ross Mocklin, when Mocklin asked Mikos at the scene of the accident whether Mikos's truck had a tachograph and Mikos's response was that it did not.
Mikos, in accordance with federal regulations, filed his daily logs for the shift of July 22, 1980 and July 23, 1980, the shift on which the accident occurred. Mikos then filed an additional log entry for the second half of this shift for July 23, 1980. All of these logs carried identical identification numbers. The original log entry for July 23 corresponded to the log entry for July 22, but did not match the tachograph readout. The subsequent log entry for July 23 was in accord with the tachograph but did not match up to the log entry of July 22. After careful examination, Mr. Martineau concluded the additional log filed for the July 23 portion of the shift had been falsified by Mikos to correspond to the stopand-go events related by the tachograph.
Plaintiffs further put on Dr. Irving Rosen, an internist who had the opportunity to examine Mikos before and after the accident. Dr. Rosen's finding relative to this case was severe scarring on the macular area[2] of Mikos's right eye. Dr. Perez, an opthalmologist, followed Dr. Rosen and, although he did not examine Mikos, testified that a scarred macular area would reduce straight ahead vision and distort depth perception especially at night. Dr. Perez then concluded with the statement that 99 percent of the people with macular scarring have corresponding blind spots.
We are faced with an individual who has some degree of impairment to his eyesight and who unquestionably had been speeding on the evening of his accident and had also deliberately tampered with his tachograph and then falsified federal logs. All of the above goes directly to the character and credibility of Mr. Mikos. After careful review and due consideration, we find Mr. Mikos's credibility impeached and give little weight to his testimony. We *840 now must decide a most difficult question: whether or not, under the facts of this case, defendants were negligent.
The essence of appellant's case, at trial and on appeal, is that Petroleum Transport was negligent in permitting Mr. Mikos, with his impaired eyesight, to drive for them, and that Mr. Mikos was negligent in failing to reduce his speed so that he could stop safely once he noticed the flashing emergency lights of Mr. Shoemaker's vehicle. Appellees assert Mr. Mikos, faced with a sudden emergency situation, did a good job of saving more lives in that he was skilled enough to maneuver his truck through the accident scene without spilling and igniting his cargo.
At trial plaintiffs utilized George Meese, their expert witness on vehicular lighting and safety, who testified that under optimal atmospheric conditions the flashing emergency lights should have been visible at a distance of one mile; the Heine pickup truck side reflectors at five hundred feet (500'); and Mr. Heine at approximately two hundred forty feet (240'). These figures were based on data collected in tests conducted during World War II. Although Mr. Meese did not conduct direct testing with any of the vehicles involved in this case, he did however make a good faith effort in applying his data to achieve his results.
There is however a problem with Meese's testimony as it regards the flashing emergency lights. All questions and hypothetical situations posed to Meese assumed clear and unobstructive view of Shoemaker's emergency flashing lights. This however was certainly not the case as Shoemaker testified he pulled off the road and behind the bridge abutment.
A review of the evidence, photo marked Heine # 36, clearly shows that the Shoemaker vehicle had pulled off the interstate highway and was behind the bridge abutment. This photo appears to have been taken from a point close to the end of the bridge and from the center lane. Even from this close vantage point, we note that only the left flasher is visible from the roadway. Additionally, with the Tyler vehicle obstructing the right lane, there is the possibility that visibility of Shoemaker's left flasher was reduced even further. Accordingly, as the night in question did not present ideal atmospheric conditions and Meese's opinion concerning the emergency flashing lights were based on an unobstructive view, we find his estimate of one mile unreliable.
Nevertheless, we are faced with the question: could Eliseo Mikos have seen what he should have seen? For resolution of that question we rely upon the testimony of Dennis Mayeux, a United Parcel Service driver who had been following Mr. Mikos on the night of the accident.
Mr. Mayeux was proceeding east in the right lane when defendant Mikos entered the interstate highway at the Chalmette exchange. Upon Mikos's entering from the right, Mayeux moved into the center lane and remained there. Mayeux testified that the lighting conditions that night were, "very poor, extremely dark."
Mayeux testified that he and Mikos were both doing 55 MPH and that he was about one and one-half truck lengths (80 feet) behind Mikos. Mayeux noticed nothing unusual until Mikos began changing from the right lane into the middle. It was at this point that Mayeux saw the disabled Heine pickup truck. However, Mayeux was only able to see the Heine truck when Mikos's headlights struck it. Prior to that, Mayeux saw nothing in his own headlights.
When Mayeux saw the Heine pickup truck, he applied his brakes extremely hard causing a complete lock-up of all wheels. It was only after skidding and then coming to a stop on the right shoulder did Mayeux see the disabled Tyler vehicle. Mayeux testified that no lights were on either disabled vehicle and that his lights did not pick up anything at the accident scene. More importantly, Mayeux further testified that at no time did he see Shoemaker's emergency flashing lights from either the center lane when his view might have been obstructed by Mikos's truck or from the right lane shoulder after coming to a stop.
*841 Mr. Mayeux was faced with virtually the same situation as Mr. Mikos: two disabled vehicles with no lights occupying two of the three lanes of an interstate highway on a dark, cloudy night. Mr. Mayeux saw nothing of the accident scene in his own headlights and was not alerted to the danger until Mikos's headlights struck the unlit disabled Heine pickup. At no time did he see emergency flashing lights. Even with the prior warning provided by Mikos's headlights, Mayeux was barely able to bring his truck under control and stop just avoiding striking the bridge.
After reviewing the record in this case we find, as did the jury, that the driver of the truck, Eliseo Mikos, was not negligent in the operation of his employer's vehicle and that whatever visual impairment he might have had was of no moment in regards to the accident before us. Since the driver was not guilty of negligence and his eyesight was of no moment, plaintiff's claim against the driver's employer, Petroleum Transport Company, based on its alleged negligence in allowing Eliseo Mikos to operate their truck must also fall.
Accordingly, we affirm the judgment of the trial court dismissing plaintiff's suit against Eliseo Mikos and Petroleum Transport Company. Appellants are to pay all costs of this appeal.
AFFIRMED.
NOTES
[1] A tachograph is a device that attaches to the speedometer cable of a vehicle and records speed, braking, idling, mileage and virtually everything a vehicle does from the time the device is turned on at the beginning of a shift until it is turned off at the end of that shift, similar to the flight recorder used in aviation. The tachograph reduces all this information to a five-inch circular disc that can be reviewed and analyzed.
[2] The macular area is the center of the retina, described by the witness as the most important part of the eye. This area is responsible for 20/20 vision allowing a person to have sharp, straight ahead vision.