474 So.2d 1320 (1985)
Gayle LABORDE, et al., Plaintiffs-Appellants,
v.
VELSICOL CHEMICAL CORP., et al., Defendants-Appellants.
No. 85-84.
Court of Appeal of Louisiana, Third Circuit.
August 21, 1985.
Rehearing Denied September 20, 1985.
*1321 William B. Baggett, Sr., Cameron, for Gayle Laborde, et al.
Thomas Benoit, Baker, for Board of Trustees State Employees Group Benefits Program.
Grove Stafford, Alexandria, for Ralph Bernard d/b/a Pest Control Co. and Interstate Fire and Casualty Co.
*1322 Thomas Nosewicz, New Orleans, for Velsicol Chemical Corp.
Thomas Bergstedt, Lake Charles, for Ciba-Geigy Corp.
David Spence, Alexandria, for Dow Chemical Co.
Randy Fuerst, Lake Charles, for Mutual Fire, Marine and Inland Ins. Co.
Steven Cook, Alexandria, for Home Indem. Ins. Co.
Richard Perles, Lake Charles, for Crown Chemical Co.
James Trimble, Jr., Alexandria, for Stephenson Chemical Co.
E. Gregory Voorhies, Lafayette, for National Union Fire Ins. Co.
Robert Guillory, Jr., Lake Charles, for Southern Mill Creek Products Co., Inc.
Before FRED W. JONES and LINDSAY, JJ., and PRICE, J. Ad Hoc.
LINDSAY, Judge.
Plaintiffs, P.J. Laborde, Jr., Gayle Laborde, P.J. Laborde, III, David Laborde, Jeanne Laborde and P.J. Laborde, Jr., as natural tutor of the minor child, Ann Laborde and intervenor, Board of Trustees, State Employees Group Benefits Program, appeal from the verdict of the jury in favor of the defendants in plaintiffs' action for damages allegedly incurred as a result of pesticide poisoning. For the following reasons, we affirm.[1]
On December 14, 1983, plaintiffs instituted the instant action. Plaintiffs alleged that in 1978, they constructed a new home located near Marksville, Louisiana. Plaintiffs alleged that since the construction of the home, defendant, Ralph Bernard, d/b/a AAA Pest Control Company, provided household pest and termite control. Plaintiffs alleged that during the course of the treatments by the employees of AAA Pest Control Co., the ground under and surrounding the home, the home itself and its contents were sprayed with dangerous and hazardous chemicals. Plaintiffs alleged that they were incrementally poisoned by exposure to excessive levels of these chemicals from 1978 to 1983 and that blood samples taken from family members, particularly Gayle Laborde, showed high amounts of chemicals. Plaintiffs alleged that their injuries were caused by the cumulative effect of the chemicals, set forth below, acting individually and in combination with the remaining chemicals.
Also named as defendants were the manufacturers, distributors, sellers and/or labelers of the various chemicals allegedly used on the Laborde property as follows:
(1) Stephenson Chemical Company dursban, diazinon and termide;
(2) Velsicol Chemical Companytermide (a combination of chlordane and heptochlor);
(3) Thompson-Hayward Chemical Companydiazinon, lindane and aldrin;
(4) Dow Chemical Companydursban; and
(5) Ciba-Geigy Corporationdiazinon.
Plaintiffs alleged that the chemicals were unreasonably dangerous for their intended use, posing an unreasonable risk of harm and that the use and manufacture of these chemicals constituted an ultrahazardous activity. Plaintiffs further alleged that Ralph Bernard, d/b/a AAA Pest Control Company and his employees were negligent in the application of the pesticides. The petition recited various and numerous physical complaints suffered by plaintiff, Gayle Laborde. It appears that she is the only family member who claims actual physical symptoms as a result of the alleged poisoning. Plaintiffs also alleged that in addition to their injuries, they had been forced to leave their family home which was contaminated by pesticides.
On June 11, 1984, Board of Trustees, State Employees Group Benefits Program filed a petition of intervention. The State Employees Group Benefits Programs provides *1323 life insurance and health and accident benefits for employees of the State of Louisiana and certain political subdivisions of the state. Intervenor alleged that at all times pertinent thereto, plaintiff, P.J. Laborde, Jr., was a member of the program enrolled for family medical coverage. Intervenor alleged that as a result of the damages sustained by the plaintiffs, intervenor had issued payments of benefits for medical expenses incurred by the plaintiffs. Intervenor alleged that it was entitled to reimbursement for the payment of these expenses pursuant to a subrogation provision applicable to the program.
The trial on the merits in this matter was extremely lengthy, approximately five weeks in duration, with numerous medical experts testifying. As it appears that only Gayle Laborde claimed to suffer physical symptoms as a result of the alleged pesticide poisoning, the trial was centered primarily on the medical evidence concerning this plaintiff. The minutes reflect that the jury deliberated from approximately 4:15 p.m. to 4:40 p.m. on August 3, 1984, before returning a verdict in favor of the defendants. The pertinent portion of the jury verdict appears as follows:

1. Were any of the following persons damaged by
 the pesticides applied to the P. J. Laborde home
 or property?
 a) Gayle .............Yes_______ No X 10
 b) P. J. .............Yes_______ No X 12
 c) Jeanne ............Yes_______ No X 12
 d) David .............Yes_______ No X 12
 e) P. J., III.........Yes_______ No X 12
 f) Ann .............Yes_______ No X 12

The claim of the intervenor was subsequently dismissed.
Plaintiffs designated the content of the record on appeal pursuant to LSA-C.C.P. Art. 2128 as follows:
1) Plaintiffs' original petition and all amendments thereto;
2) The testimony of Dr. Victor Alexander;
3) All of the proceedings after the defendants' rested including, without limitation, the following:
a. The trial court's charge to the jury;
b. Plaintiffs' objections to the charges;
c. The trial court's ruling on the charges;
d. The verdict form;
e. The judgment;
f. Plaintiffs' motion for a new trial and amendments thereto;
g. The trial court's denial of the motion for a new trial.
While it is not possible for this court to ascertain the identity of all of the witnesses who testified at the trial from the record, it is clear that appellants failed to designate the testimony of plaintiff, Gayle Laborde, and that of her primary treating physician, Dr. William Rea, as part of the record on appeal. Further, many of the pleadings and exhibits are not contained in the record before us.
On appeal, the appellants present the following issues for review by this court:
1) Whether the trial judge erred by giving erroneous, contradictory, repetitive, confusing, misleading and incoherent instructions and therefore whether the jury verdict rendered under these instructions must be set aside; and
2) Whether the jurors committed misconduct by returning an unreasonably quick verdict, contrary to the instructions to consider all of the law and evidence and under the circumstances of a long and exceedingly complex trial and therefore whether this verdict must be set aside.
The alleged erroneous instructions are as follows:
1) The trial judge erred in instructing the jury that a manufacturer of pesticides discharges its duty to warn the ultimate consumer about the dangers of pesticides by conveying warning information to intermediate formulators and applicators;
2) The trial judge erred in instructing the jury that the adequacy of a manufacturer's warning is not at issue if the plaintiffs deny seeing the warning;
3) The trial judge erred in instructing the jury that if an adequate warning or *1324 instruction is given by the manufacturer of a product, it is not unreasonably dangerous to normal use;
4) The trial judge erred in instructing the jury four times that an individual cannot recover for injuries caused by pesticides if that individual is sensitive or allergic to pesticides.
Other allegedly erroneous instructions are as follows:
1) Circumstantial evidenceinstruction that if plaintiffs rely on circumstantial evidence in attempting to meet their burden of proof, then that evidence must exclude every other reasonable conclusion or theory other than the one plaintiffs advance;
2) Failure to instruct on forseeable misuse;
3) Erroneous negligence instructions, in particular, the standard of care owed by a pesticide spraying contractor; and
4) Instructions as to plaintiffs' contributory negligence and assumption of risk;
Finally, appellants argue that the jury instructions constituted reversible error because they were repetitious, unclear, incoherent, unordered and were presented in a disjointed format.

JURY INSTRUCTIONS
It is well-settled that adequate jury instructions are those which fairly and reasonably point up the issues and which provide correct principles of law for the jury to apply to those issues. Oatis v. Catalytic, Inc., 433 So.2d 328 (La.App. 3rd Cir.1983), writ denied, 441 So.2d 210 (La.1983) and 441 So.2d 215 (La.1983), Reed v. Gulf Ins. Co., 436 So.2d 580 (La.App. 4th Cir.1983), reversed on other grounds and remanded, 441 So.2d 752 (La.1983), on remand, 447 So.2d 1102 (La.App. 4th Cir.1984), Lincecum v. Missouri Pacific R. Co., 452 So.2d 1182 (La.App. 1st Cir.1984), writ denied, 458 So.2d 476 (La.1984), Miller v. Fogleman Truck Lines, Inc., 398 So.2d 634 (La. App. 3rd Cir.1981), writ denied, 401 So.2d 358 (La.1981), West v. State Boat Corp. 458 So.2d 647 (La.App.Cir.1984), McElroy v. Vest, 407 So.2d 25 (La.App. 3rd Cir.1981), writ denied, 412 So.2d 83 (La.1982) and numerous citations therein.
The adequacy of a jury instruction must be determined in light of the jury instructions as a whole. Brown v. White, 405 So.2d 555 (La.App. 4th Cir.1981), writ granted, 409 So.2d 657 (La.1982), reversed and remanded in part and affirmed in part, 430 So.2d 16 (La.1982), Lincecum v. Missouri Pacific R. Co., supra, and Heine v. Adams, 464 So.2d 836 (La.App. 5th Cir. 1985) and citations therein.
If the court gives misleading, confusing instructions or omits an applicable essential legal principle, then such instructions do not adequately set forth the law and may constitute reversible error. Reed v. Gulf Ins. Co., supra. See also Heine v. Adams, supra. The manifest error standard of appellate review may not be ignored unless the jury charges were so incorrect or inadequate as to preclude the jury from reaching a verdict based on the law and the facts. Brown v. White, supra.
The "... standard of appellate review is that the mere discovery of an error in the trial judge's instructions does not itself justify the appellate court conducting a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case." Lincecum v. Missouri Pacific R. Co., supra, at 1190. See also Brown v. White, supra.
Appellants first argue that the alleged numerous prejudicial instructional errors set forth hereinabove require that the jury verdict be set aside. Appellants request that we review the jury instructions, without reference to any evidence submitted at trial, and hold that the jury instructions were erroneous and prejudicial and therefore the jury verdict should be reversed. Appellants request that having concluded that the verdict must be reversed that this court then either remand for a new trial or order up the record for a trial de novo after deciding the "partial appeal." Appellants contend that their appellate argument is one of law and not of fact and thus they *1325 seek a determination as to the validity of the jury instructions without reference to the evidence adduced at trial. Appellants contend that the issue of whether the jury manifestly misinterpreted the facts of the case is not raised in this "partial appeal" and is not before this court and therefore, without the full record of evidence, this court cannot determine manifest factual error. However, the record has been supplemented and now appears to contain all the medical testimony presented at trial, except for that of Dr. William Rea, plaintiff's primary treating physician. As noted earlier, Dr. Rea's testimony was not designated by appellants as part of the record for this appeal.
Under LSA-C.C.P. Arts. 2128 and 2129, the appellants had the duty to designate the record on appeal. Further, it is well-settled that if the record is deficient or incomplete, it must be assumed that the evidence missing from the record and not designated by appellants for consideration of their appeal, supported the judgment of the trial court. See Field v. Merritt, 449 So.2d 7 (La.App. 1st Cir.1984), writ denied, 450 So.2d 964 (La.1984), Johnson v. Berry Bros. Gen. Contractors, 405 So.2d 1234 (La.App. 1st Cir.1981), writ denied, 410 So.2d 1135 (La.1982) and citations therein.
Appellants argue that in order to consider the manifest error of jury fact findings, an appellate court must actually have before it the factual findings of the jury rendered after a proper charge of all the law applicable to the case. Appellants assert that in the instant case, because the jury was improperly instructed, its factual determinations, if any, that could possibly be inferred from the verdict are wholly irrelevant.
Thus, although all the medical testimony bearing on the issue of causation, except that not designated by appellant, is before this court, appellant still seeks to have this court consider the alleged erroneous jury instructions in a vacuum, that is, in isolation from and without regard to the evidence presented at the trial on the merits which was evaluated by the jury in reaching its verdict. Implicit in the appellants' argument is a presumption that any error in the jury instructions would constitute prejudicial and therefore, reversible error.
However, as noted previously, the standard of review by this court is that the mere discovery of an error in the jury instructions does not justify the appellate court conducting a trial de novo, without first measuring the gravity or degree of error and considering the instructions as a whole and the circumstances of the case. Thus, the appellate review of the jury instructions necessarily requires an evaluation of those instructions in light of the evidence designated on appeal and contained in the appellate record. We find that the appellants' suggested mode of review, that is, an examination of the jury instructions without regard to the evidence presented at trial, is an inappropriate standard of review and will not be employed by this court. Therefore, we will now undertake to evaluate the jury instructions in light of the lengthy and voluminous record before us.
The testimony of the following witnesses is contained in the record before this court.
Dr. Victor Alexander, a specialist in occupational medicine at Ochsner's Clinic, testified on behalf of the plaintiffs. Dr. Alexander examined the plaintiff, reviewed plaintiff's records and personally visited the Laborde home. Although the majority of the extensive medical tests conducted on plaintiff at Ochsner's had normal results, Alexander testified that the CPST test, which is a correlated pesticide screening test, was abnormal. Alexander testified that plaintiff was suffering from pesticide overexposure, toxic acquired porphyria and neuropsychiatric syndrome secondary to pesticide exposure. Alexander stated that he based his diagnosis of pesticide overexposure upon the application on repeated occasions of a variety of pesticides, not in accordance with label directions and the measurement on numerous occasions of levels of pesticides higher than would be expected on the basis of general environmental exposure in plaintiff's blood. Based on these facts, Alexander testified *1326 that this diagnosis had nothing to do with chemical sensitivity. Alexander testified that he believed that many of plaintiff's symptoms were on the basis of a direct toxic effect from chronic exposure to pesticides found in the home. Alexander testified that the pesticide levels in plaintiff's blood had two phases. In April, 1983, high levels were detected. Following a ten day hospitalization stay outside of the home environment, the levels dropped significantly. Plaintiff later returned home and the levels measured in January, 1984 were almost as high as the levels first presented in April. Alexander advised plaintiff to avoid pesticide exposure, including avoiding contact with her home and the items therein. Alexander stated plaintiff's pesticide levels again dropped significantly by avoiding such contact and moving into a special cottage. Alexander explained that neuropsychiatric syndrome involves changes in the nervous system and behavior and includes such symptoms as vague muscle pain, nervousness, difficulty in concentrating and joint pain. Alexander testified this was due to chronic, lower level exposures. Alexander testified plaintiff did have an acute overexposure to pesticides when she walked through a pool of chemicals in October, 1982. Alexander stated he believed plaintiff's prognosis was guarded but positive. Alexander testified that over a period of time as plaintiff's contamination level continued to drop, her symptoms should become less prominent with possible substantial improvements in plaintiff's state of health. Alexander had a fat biopsy extracted from the plaintiff for pesticide screening and the samples were sent to a laboratory for testing. However, Alexander felt the results of the tests were inaccurate and the sample had not been repeated at the time of trial.
Dr. Richard Michel, a family practice physician, testified on behalf of the plaintiffs. Dr. Michel began seeing plaintiff, Gayle Laborde, as a patient in June, 1967. Michel treated plaintiff over the years for essentially routine various complaints such as infections. Michel testified that plaintiff was admitted to Marksville General Hospital on April 13, 1982 with multiple complaints. She was discharged with a diagnosis of shingles, elevated cholesterol and hyperventilation syndrome. Michel saw plaintiff in July, 1982 and in September, 1982, and plaintiff reported multiple complaints. Michel prescribed valium for the plaintiff. During this period, Michel stated that plaintiff was going from doctor to doctor. Michel also saw the plaintiff in February, 1983 and December, 1983. Plaintiff continued to report multiple complaints. Michel stated he believed that plaintiff's mental and physical condition had progressively worsened since approximately April or May, 1982. Michel stated that prior to 1982, he had not noticed that plaintiff had any particular sensitivity to drugs or chemicals. Michel testified that he did not consider plaintiff to be a hypochondriac and that her physical complaints were essentially consistent up to 1982. Michel stated that many of plaintiff's complaints were general in nature and those of a normal child bearing female.
Dr. Francisco A. Silva, a psychiatrist, testified on behalf of the defendants. Dr. Silva testified that he first examined plaintiff, Gayle Laborde, on June 21, 1982 after she was referred to him by another physician. Plaintiff stated to Silva that her difficulties had begun around March 1982, following a trip to Mexico and she described varied numerous physical symptoms which she experienced. Silva stated he felt that plaintiff was very tense, anxious and depressed with some conversion symptoms. Silva explained that conversion symptoms produce a tendency to express nervousness in a physical fashion. Silva stated that depression is an affective disorder and that people with depression may have a number of physical complaints. Silva placed plaintiff on anti-depressant medication and next saw the plaintiff on July 7, 1982. At that time, plaintiff had complaints involving every organ system in her body. Silva prescribed an anti-anxiety medication. Silva saw the plaintiff again on August 19, 1982 and found that there was no change in her condition. Plaintiff was quite anxious, reported physical complaints and a great number of fears and *1327 overwhelming feelings. Silva saw the plaintiff on September 7, 1982 and testified plaintiff had a great number of physical complaints and appeared to be depressed and agitated. On November 4, 1982, Silva testified he saw the plaintiff for the last time and there was no change in her complaints. Silva prescribed another anti-depressant and anti-anxiety medication. Silva prescribed a low dosage of these medications as plaintiff had been somewhat sensitive to medication. Silva testified that it was his impression that plaintiff was suffering from an anxiety state or panic disorder. Plaintiff had numerous symptoms which could be interpreted as symptoms associated with anxiety such as "GI" problems, fast heart beat, fearfulness and muscular tension. Based upon plaintiff's symptoms, Silva testified he did not feel that plaintiff had toxic brain syndrome which could be caused by toxic substances nor did she have neuropsychiatric syndrome. Silva stated that the term neuropsychiatric syndrome was not a diagnostic term and does not have any definite meaning. Silva testified that the plaintiff demonstrated much concern about her physical complaints and that it was difficult to get plaintiff away from discussing these complaints.
Dr. Dennis Franklin, a neurologist and psychiatrist, testified on behalf of the defendants. Dr. Franklin testified that he first saw the plaintiff on June 11, 1984. Plaintiff told the doctor that she had developed a toxic syndrome to pesticides and related numerous physical complaints beginning in 1982. In his mental status examination, Franklin testified that it was obvious that the plaintiff was significantly depressed but that he did not see any evidence of an overt psychosis or an organic brain syndrome. Franklin testified that he spent approximately twenty hours reviewing plaintiff's medical records and stated that plaintiff's medical history was not consistent with pesticide poisoning. Franklin explained that organochlorine pesticides create neurological syndrome seizures or convulsions which are a fairly dramatic medical presentation and which are not likely to be missed by physicians. Plaintiff's medical records evidenced no history of any such seizures. Organophosphate pesticides present a syndrome or constellation of symptoms characterized by pin-point pupils, restriction of bronchi with wheezing, increased fluid in the lungs or pulmonary edema, diarrhea, increased sweating and urination. Franklin testified he did not find a medical history consistent with this syndrome. Franklin testified he felt that the plaintiff was suffering from a psychiatric disorder and depression with somatization as a prominent feature of her depression. Franklin testified that he thought plaintiff had a very adequate and thorough neurological examination. Plaintiff's records revealed that she had seen four neurologists and the results of all of these tests were normal. Franklin testified that the term neuropsychiatric syndrome is not a term used either in neurology or psychiatry as it is too vague and non-specific, nor is it a diagnosis.
Dr. Albert Hensel, a specialist in allergies and immunology, testified on behalf of the defendants. Hensel stated he first saw the plaintiff on June 18, 1982. Plaintiff related that she was healthy until approximately March 8, 1982 and recited a considerable number of symptoms. Hensel testified he evaluated her for an allergic type reaction or disease and performed an allergic work-up. Hensel performed a battery of extensive tests including tests for unusual, exotic diseases and the results were normal with the exception of the plaintiff's high cholesterol level. Hensel also performed some delay sensitivity patch testing for chemical and food sensitivity. Plaintiff did not display any allergic reactions and the tests indicated that plaintiff's immune system was intact. On July 2, 1982, December 17, 1982 and March 21, 1983, Hensel saw the plaintiff and she recited numerous physical complaints on each occasion. Hensel stated that as far as he could tell, plaintiff did not have an allergy-immunology problem. Hensel testified plaintiff was "terribly ill" but her illness did not fall in his field. Hensel stated that the next stage to find out what was wrong with plaintiff was to accept a psychological problem.
*1328 Dr. Lou Fink, a psychiatrist, testified on behalf of the defendants. Dr. Fink saw plaintiff for the first time on March 29, 1983. Fink testified that plaintiff had stated that things had not been going well for her for about three years since the family had moved back from Spain. Plaintiff had a lot of physical complaints which she stated had begun the previous year. After the interview, Fink stated that it was her impression that plaintiff was suffering from a major depression with multiple somatic complaints. Plaintiff related many symptoms on the left side of her body which Fink believed to be from an emotional etiology. Plaintiff entered Cypress Hospital and Fink testified she saw her there on April 2 and April 3, 1983. Plaintiff stayed approximately one day in the hospital and then demanded to be discharged. Fink stated she was discharged against medical advice. Fink testified that the term neuropsychiatric syndrome was not a diagnosis.
Dr. Walter Goodin, a psychiatrist, testified on behalf of the defendants. Dr. Goodin testified he first saw plaintiff on November 19, 1982 upon a referral from another physician. Goodin did an initial psychiatric evaluation. He did not request any further medical tests as he felt plaintiff had undergone a very thorough medical evaluation. Plaintiff indicated to Dr. Goodin that March, 1982 was the first time that she had any physical or emotional symptoms. Goodin felt plaintiff's gastrointestinal disorder or symptoms were triggered by stress or emotion and he continued her on a tranquilizer which had been previously prescribed for plaintiff by another physician. Goodin next saw plaintiff on November 30, 1982 and at that time suggested psychiatric hospitalization which plaintiff stated she would consider. On December 7, 1982, Goodin again saw the plaintiff. On that date, plaintiff was extremely tense and apprehensive and showing increasing signs of a depressive disorder. Plaintiff entered Rapides General Hospital the following day but decided not to be admitted into the psychiatric unit of the hospital which was the recommendation of Goodin. Goodin saw plaintiff several times in the hospital and prescribed anti-depressant medication. Plaintiff continued to have multiple complaints secondary to anxiety and depression. Following plaintiff's discharge from the hospital, Goodin saw the plaintiff in his office on December 16, 1982. At that time, plaintiff had discontinued the anti-depressant medication on her own volition. Goodin testified that a depressive disorder was his primary diagnosis. Goodin testified that he terminated contact with plaintiff on March 28, 1983. Plaintiff continued to have essentially the same complaints but cancelled several appointments and failed to take medication as directed. Goodin stated that he felt he had nothing further to offer to plaintiff.
Dr. Kenneth Calamia, a rheumatologist, testified on behalf of the defendants. Dr. Calamia testified that he first saw the plaintiff on November 9, 1982 and she recited various physical complaints. Calamia testified that plaintiff had stated she had not felt well since February 1982. Calamia stated his examination was unremarkable at that time and that he told plaintiff that he felt most of her symptoms were the result of nervousness, stress and anxiety. Calamia performed blood studies primarily for plaintiff's reassurance and the results were normal. Calamia saw plaintiff on November 15, 1982 and again discussed the emotional factors in plaintiff's physical complaints. Calamia advised the plaintiff to try to understand that she was not physically ill and the actual emotional sources of her symptoms and to avoid further medical evaluations for some time. Calamia saw plaintiff again on March 31, 1983 and she essentially had the same types of symptoms at that time. Calamia examined the plaintiff and advised her to stop doctor shopping and to continue to work with her psychiatrist.
Dr. Steven Thore, an "OB-GYN" specialist, testified on behalf of the defendants. Dr. Thore testified he saw plaintiff on two occasions, October 25, 1982 and March 14, 1983. On October 25, 1982, plaintiff came in for a routine annual examination and Thore testified his physical examination *1329 was completely normal at that time.[2] On March 14, 1983, Thore examined plaintiff and found that she had a vaginal infection.
Dr. James Wedner, an allergy and immunology specialist, testified on behalf of the defendants. Dr. Wedner testified he had spent approximately 59 hours reviewing plaintiff's medical records. Wedner stated he did not believe plaintiff had any symptoms referrable to allergies or immunology and that there was nothing wrong with plaintiffs immune system. Wedner testified that from an examination of plaintiff's records, he believed that her disease had begun in 1972. Wedner stated that he did not believe that plaintiff had vasculitis as her sedimentation rate was normal and the majority of patients with vasculitis have an elevated rate. Wedner testified that plaintiff was suffering from a great deal of anxiety which she somatized or essentially converted into physical symptoms. When asked whether the level of pesticides in the soil and air samples from the Laborde home and in plaintiff's blood sample had anything to do with plaintiff's present condition, Wedner replied negatively. Wedner explained he did not think plaintiff's condition was in fact a physical illness and further, the pesticides amounts were at a very low level. Wedner testified that these reported levels have never been shown to have any influence on the immune system in man or experimental animals.
Dr. Waylon Hayes, Jr., a toxicologist, testified on behalf of the defendants. Dr. Hayes testified he was contacted by plaintiff, P.J. Laborde, Jr., for an opinion. Hayes believed that the pesticide values found in the blood serum of plaintiff, Gayle Laborde, were not exceptional for the general population and not at a toxic level. Hayes reviewed many of plaintiff's medical records and testified that he did not believe that plaintiff was suffering from acute or chronic overexposure to pesticides or from a chemical sensitivity caused by exposure to any of the chemicals. Hayes testified that plaintiff did not show any signs of acute overexposure to chlordane or heptachlor, the characteristic effect of which is a convulsion, possibly accompanied by some nausea and vomiting. Hayes testified the "difficulties are all packed into a very short interval of time" and that poison victims recover promptly with no permanent effects. Hayes stated a significant amount of chlordane and heptachlor would be necessary to produce an effect and it was possible to tolerate low levels of exposure over a long period of time without any harmful effects. Hayes testified that he attached no clinical significance to the levels of pesticides in plaintiff's blood nor did he believe that the Laborde home was contaminated. Hayes stated that there was no synergistic effect among chlordane, heptochlor, dursban and diazinon. In other words, the chemicals would not act together to produce a greater or enhanced effect. Further, these chemicals are metabolized by the body. Hayes further testified that plaintiff did not show any signs of organophosphate poisoning, the characteristic cluster of symptoms which typically include profuse secretions from the respiratory tract interfering with breathing, narrowing of the trachea and bronchi, muscle weakness, pulmonary edema, profuse sweating and pin-point pupils. Hayes testified artificial respiration may become necessary but that with proper treatment, a poison victim should return to normal. Hayes testified that most of the reported cases of dursban and diazinon poisoning involved ingestion or drinking of the solution.
Dr. Henry Ehrlich, a psychiatrist, testified on behalf of the defendants. Dr. Ehrlich saw the plaintiff five times in February and March, 1983. Ehrlich testified that plaintiff had related she began to experience physical symptoms after the family returned from Spain in 1979. Based on his examination of plaintiff, Ehrlich formed a diagnosis of hypochondriasis. Ehrlich explained that this is a nervous disorder which consists of an unrealistic interpretation of physical symptoms which have no *1330 medical basis as being a physical disorder. Ehrlich testified that hypochondriasis is a nervous disorder with a typical onset after the age of forty. The patient is predominantly afraid of having an illness and will search from doctor to doctor in order to confirm that. Ehrlich classified hypochondriasis as a serious mental illness. Dr. Ehrlich stated that he also considered that plaintiff might have a somatization disorder, depression and impending psychosis but did not make a diagnosis of these disorders. Ehrlich testified that in his opinion, plaintiff was not coping with her true emotions but rather was converting her feelings into physical complaints. Ehrlich stated he felt plaintiff was severely ill and recommended psychiatric hospitalization because of a possible loss of contact with reality or decompensation, to which plaintiff responded negatively. Ehrlich prescribed an anti-anxiety medication. Ehrlich stated if plaintiff failed to receive treatment for her condition, three possible things could happen. Plaintiff could develop a major depressive disorder or she might develop a paranoid psychosis, losing touch with reality. Plaintiff could also stabilize in a situation where she would become obsessed with her symptoms, going from doctor to doctor trying to find a solution of a physical, medical nature which would be accompanied by a decrease in social functioning and isolation in a small place, like a home.
Dr. Richard de Shazo, a clinical immunologist, testified on behalf of the defendants. Dr. Shazo testified he saw plaintiff in March, 1983 and plaintiff had numerous complaints involving almost every organ system in her body. Plaintiff related that her complaints began in February, 1983 subsequent to a trip to Mexico. Shazo performed a complete physical examination and numerous laboratory tests, as well as reviewing previous medical tests. The results of these tests were normal. Shazo also performed allergy testing, including delay sensitivity skin testing and found that plaintiff's immune system was functioning properly. Shazo testified that from the plaintiff's history and the results of the laboratory testing, there was no evidence of immunological abnormalities, connective tissue disease or arthritic condition. Shazo testified that he felt plaintiff had chronic anxiety neurosis and irritable bowel syndrome which is a minor specific syndrome involving stomach complaints. Shazo recommended that she continue psychotherapy and discontinue doctor shopping.
Dr. Jeffrey Ellison, a staff neurologist with Ochsner's Clinic, testified on behalf of the defendants. Dr. Ellison testified he saw plaintiff on May 26, 1982 at Ochsner's Clinic after she demanded to see a neurologist. Plaintiff presented Ellison with a lengthy list of symptoms and complaints, some of which were distinctively unusual in nature, involving a wide variety of organ systems. Many of plaintiff's symptoms seemed to be concentrated in the left side of her body. Ellison explained that the right side of the brain, which controls the left side of the body, essentially controls emotional perception, so that if there is an emotional disturbance, the symptoms tend to refer to the left side of the body. This is known as left-sided syndrome. Ellison conducted a neurological examination and formed the impression that there was no evidence of a neurological disease. Ellison stated he found the plaintiff to be depressed or emotionally flat and felt that she was the "ultimate hypochondriac." Ellison stated that he did not know of a specific definition of neuropsychiatric syndrome and the term was very broad and vague. Ellison stated that plaintiff had a number of neurological tests at Ochsner's, the results of which were all normal.
Dr. George Welch, a specialist in internal medicine and gastroenterology, testified by deposition. Dr. Welch stated that he first saw the plaintiff on October 8, 1974 and at that time, plaintiff had numerous physical complaints. Welch performed a physical examination and various tests, the results of which were essentially normal with the exception of an elevated blood fat. Welch referred plaintiff to other physicians for consultation on various medical problems. Welch prescribed a low cholesterol diet and reduced carbohydrate intake. Welch saw the plaintiff again on December 30, 1975.
*1331 Plaintiff had an upper respiratory infection and reported several complaints. Welch performed a physical examination and tests which were normal. Welch reported that the only finding with which he was concerned was a few "course rales" in plaintiff's chest as though plaintiff might have been recovering from bronchitis or a respiratory infection. On April 26, 1981, plaintiff was seen for a general check-up and reported numerous physical complaints. Plaintiff was hospitalized at East Jefferson Hospital from April 26, 1981 through April 30, 1981. The physical examination and tests, including a blood chemistry profile, had essentially normal results with the exception of elevated cholesterol, fibrocystic changes in plaintiff's breasts and blood in the stool. Welch testified plaintiff was in fair health considering her past medical history of a clot in the lung or pulmonary embolus, varicose veins in both legs and phlebitis in the left leg. Welch indicated that the plaintiff was essentially in the same condition that she had been in for some time with the exception of the changes in plaintiff's breasts. Welch testified he did not find any indication of any sort of an allergic reaction to any chemicals at that time.
Dr. Steven Dorfman, an endocrinologist, testified by deposition. Dorfman saw the plaintiff on April 14, 1983 at the request of another physician on a consultant basis when she was hospitalized. Dorfman testified that plaintiff reported numerous complaints. Dorfman stated he found that plaintiff's endocrine tests were normal and he felt that plaintiff had a lot of "agitation depression" and that many of her problems were due to her anxiety from a preoccupation about her health.
Dr. Palmer Texada, a general surgeon, testified on behalf of the defendants. Dr. Texada apparently began treating plaintiff in 1969 upon the referral of another physician. Texada saw the plaintiff on March 29, 1982 and plaintiff reported generalized pain primarily in the left side of her body. Due to plaintiff's multiple complaints, Texada performed numerous medical tests, the results of which were all normal. Plaintiff was hospitalized in April, 1982 and further medical testing was performed. Texada testified the test results were normal with the exception of an elevated blood fat. Texada saw plaintiff in his office in early May 1982, after her hospitalization and at that time referred the plaintiff to a psychiatrist.
Dr. Thomas Rockel, a neurologist, testified by deposition. Rockel testified that if a person has been exposed to an excessive amount of pesticides, there is a particular constellation of symptoms which includes a fairly violent reaction with salivation, diarrhea and a very acute toxic type of reaction. Dr. Rockel saw the plaintiff on July 20, 1982 upon a referral by another physician. Plaintiff reported numerous physical complaints. Rockel's physical examination was essentially normal with the exception of plaintiff being mildly overweight. Plaintiff's neurological examination was also normal, except for the complaint of pain in the area of the herpes zoster lesions. Rockel testified that a diagnosis of vasculitis was not indicated due to plaintiff's normal laboratory results, primarily a normal sedimentation rate. Rockel found no evidence of pesticide poisoning. Rockel testified that plaintiff had a character or air about her which suggested a great deal of anxiety and emotional overlay to her symptoms. Rockel saw the plaintiff again on December 30, 1982 and felt that plaintiff's physical and neurological evaluations continued to be basically normal at that time. However, Rockel had plaintiff hospitalized for additional testing. Plaintiff was in the hospital from January 3, 1983 to January 5, 1983 and underwent extensive medical testing. With the exception of a few minor findings, plaintiff's test results were all normal. Rockel testified that the tests revealed no evidence that plaintiff was suffering from porphyria. Rockel explained that this is a very unusual illness which often starts in adolescence and occurs more in women. The illness is associated with hypertension, psychiatric symptoms and vague belly pain. Further, Rockel testified he did not find any evidence of poisoning by any organophosphate or organochlorine pesticides. Rockel testified that as a result *1332 of all the normal test results, he felt that plaintiff's problems were psychosomatic in nature. Rockel saw the plaintiff again in April, 1983 as plaintiff was continuing to have numerous complaints. Rockel had an "EEG" or electroencephalogram performed at that time which was normal. Rockel found no evidence of organic brain syndrome. Rockel testified that neuropsychiatric syndrome is not a clearly defined term or recognized entity.
Dr. James Pate, a specialist in ear, nose and throat surgery and medicine, testified on behalf of the defendants. Pate first saw the plaintiff on August 5, 1968 when she reported that she was suffering from headaches. Pate conducted an examination which was normal and prescribed medication for plaintiff's headaches. From that time, Pate treated plaintiff for various minor complaints up until May, 1982. On September 22, 1980, Pate diagnosed plaintiff as having allergic rhinitis which he stated may have been a result of plaintiff's smoking. Pate suggested at that time that plaintiff discontinue smoking.
Dr. Susan Danahey, a clinical psychologist, testified on behalf of the defendants. Dr. Danahey testified that she saw plaintiff, Gayle Laborde, upon the referral of another physician on June 12, 1984. Danahey testified that the brief history given to her by the plaintiff indicated that the plaintiff was in her usual state of health until February or March, 1982. Danahey stated that the symptoms seemed to appear gradually but were greatly intensified after October, 1982 when plaintiff was allegedly exposed to a significant amount of chemicals when her patio was sprayed. Dr. Danahey administered a personality test to plaintiff. The test was the Minnesota Multi-Phasic Personality Inventory, known as the MMPI. Briefly stated, the test is an objective written test consisting of a total of 566 true/false items which are grouped into different scales and which provide assistance in diagnosing psychological and psychiatric disorders and in assessing personality. Danahey testified that she considered the test to be a valid and reliable test. Based on the results of the test, Danahey testified that her psychological diagnosis of plaintiff would be a form of a conversion or somatical disorder. Danahey explained that with a conversion disorder, a person develops physical symptoms in times of stress as a means of handling conflicts that are psychological in nature rather than physical. This is also known as a "1-3" personality and Danahey testified that a person with this personality tends to report symptoms in almost every organ system in the body. Danahey testified that she did not think that a long, undiagnosed illness followed by a diagnosis of a serious disease process would act to cause a "1-3" personality profile.
Dr. S.R. Abramson, a family practice physician, testified on behalf of the defendants. Dr. Abramson testified he first saw the plaintiff on November 13, 1964 when plaintiff reported several physical complaints including irregular menses, extreme nervousness and depression. Plaintiff's physical examination was normal and Abramson prescribed librium for anxiety. Abramson admitted plaintiff to the hospital on November 19, 1978 and March 31, 1982. The tests performed during these periods of hospitalization were essentially normal. In November, 1978, Abramson found that plaintiff had capillary fragility, in which the small blood vessels break easily and acute gastroenteritis. In March, 1982 plaintiff reported multiple complaints. The diagnosis at that time was herpes zoster, which is a virus infection of the nerve, commonly known as shingles. Herpes zoster is first manifested by pain in the nerve and the development of skin lesions. Abramson saw the plaintiff again on July 16, 1982. Plaintiff reported various complaints and the physical examination again was negative. Abramson placed the plaintiff on anti-anxiety medication.
Dr. Thomas Davis, a specialist in internal medicine, testified on behalf of the defendants. Dr. Davis first saw the plaintiff when she was hospitalized in November, 1970 for a hysterectomy. Davis was asked to see the plaintiff by Dr. Texada as a precautionary measure before surgery due to her past history of phlebitis in the left leg and a previous clot in the lung. Davis *1333 followed plaintiff during her hospitalization and assisted in treating her for various post-surgical complications. Davis later hospitalized the plaintiff in 1972 for episodes of shortness of breath. The results of the physical examination and medical tests were normal. Davis diagnosed plaintiff as having hyperventilation syndrome which is caused by anxiety. Davis prescribed a tranquilizer for the plaintiff. Davis testified that he did not find any organic reasons for plaintiff's reported symptoms.
Dr. Pedraz Gagic, a general surgeon, testified on behalf of the defendants. Gagic testified he saw plaintiff on five occasions from July 23, 1982 to February 23, 1983. Gagic stated on July 23, 1982, the plaintiff had multiple complaints. Gagic's physical examination was perfectly normal except for a slight tenderness in the upper part of the abdomen. During subsequent visits plaintiff continued to report multiple complaints which were somewhat localized in the abdominal area. Gagic recommended an endoscopy, which is a special examination of the stomach, which procedure plaintiff apparently had performed at a later date by another physician. Gagic testified that on the five occasions he examined plaintiff, he did not find any evidence of an organic disease. However, Gagic stated he did not have the opportunity to do a detailed investigation to find the reasons for plaintiff's complaints. Gagic testified that his first impression was that plaintiff might be a hypochondriac.
Dr. Eric Comstock, a specialist in medical toxicology, testified on behalf of the defendants. Comstock testified that the organophospate chemicals, dursban and diazinon, produce a recognizable syndrome or constellation of symptoms in acute poisoning. These symptoms include profuse sweating, pulmonary edema, pinpoint pupils, tearing of the eyes, profuse salivation, diarrhea, and muscle twitching. The muscles in the diaphragm may become paralyzed which may ultimately result in respiratory failure. If a person does not die from the poisoning, Comstock testified that there are no residual injuries from the poisoning except for possible brain damage due to lack of oxygen. Comstock stated these chemicals are not stored in the body for a long period of time but rather the chemicals are metabolized by the body and excreted in urine. Comstock stated that the usual interval between the exposure and the appearance of symptoms is from 45 minutes to an outside limit of eighteen to twenty hours. Comstock testified the chemicals had never been known to affect the immune system or to cause psychiatric or neurological problems. Comstock reviewed plaintiff's medical records and stated that she never presented the classic symptoms of organophospate poisoning. Comstock testified that whether the toxic dose occurred from a single, large scale exposure or from long term exposure to low levels, the effects would be the same. Comstock testified that in his opinion, after a review of plaintiff's medical records, plaintiff was suffering from a personality disorder which had no organic basis. Comstock testified there was no evidence that plaintiff had porphyria. With reference to the chemicals, chlordane and heptachlor, Comstock testified that the classic symptoms of poisoning are convulsions. Comstock testified there were no known residual effects. Comstock stated that there was no evidence to indicate plaintiff had showed any effects from exposure to these chemicals. Comstock testified that due to the concentration of the chemicals commonly used in households such as diazinon, it would require a significant amount of the chemical to become accutely ill, such as drinking a quart of the solution. Comstock testified that all of the cases of significant poisoning have resulted from suicide attempts from use of the low concentrations or from contact with the concentrated material. Comstock stated that the levels of pesticides in the Laborde home were minute and well below the no-effect level. Comstock did not find the pesticide levels in plaintiff's blood samples to be significant or high enough to cause a toxic effect. Comstock testified that there is no synergistic effect among these chemicals.
Based upon the evidence at trial, including the testimony of the medical experts *1334 summarized above, the jury found that the plaintiffs were not damaged as a result of the application of pesticides to the Laborde home. This answer to the jury interrogatory was clearly a finding that the plaintiffs failed to prove the most essential element, causation. Under the circumstances of this particular case, the question of causation was the primary burden of proof for the plaintiffs and the primary issue before the jury in its deliberations. As the jury apparently found that plaintiffs failed to meet their burden of proof on the issue of causation, the principal consideration of this court on appeal is whether the alleged erroneous jury instructions improperly influenced the jury in the determination of causation.
It is fundamental under the law of Louisiana that the issue of causation is the initial question to be considered by the trier of fact and that in the absence of a finding of causation, further consideration as to the conduct of the defendant is both immaterial and unnecessary. In other words, if the defendant's conduct did not cause harm to the plaintiff, then the negligent or inappropriate nature of that conduct is immaterial.
In the instant case, if the jury's finding of a lack of causation is reasonably supported by the record before us and was not influenced by erroneous instructions on this issue, then the judgment of the trial court should be affirmed and further consideration of the other alleged erroneous instructions is unnecessary as any error in these instructions would constitute harmless error.
A review of the alleged erroneous jury instructions noted earlier reveals only one instruction which may have conceivably influenced the jury in the determination of causation. This instruction will be discussed in detail below. The other instructions, with the exception of the instruction on circumstantial evidence, concerned issues which would only be reached after an initial finding of causation, such as the duty of a manufacturer to warn. Thus, the alleged erroneous nature of these instructions, if any, would be harmless error. Furthermore, in light of our conclusions regarding the issue of causation, any further comments by this court regarding accuracy or inaccuracy of these instructions would be dicta.
Appellants argue that the court erred in giving an instruction regarding the use of circumstantial evidence since appellants did not rely on circumstantial evidence but rather introduced direct evidence. Appellants assert that this instruction had the effect of imposing a higher burden of proof upon them and thus was prejudicial.
A reading of the language of this instruction reveals that the trial court prefaced the instruction with the limiting phrase "(i)f the plaintiffs rely on circumstantial evidence." In other words, the trial court did not instruct the jury that the plaintiffs were relying on circumstantial evidence but rather merely instructed the jury on the burden of proof if such evidence was presented. The content of the instruction defining circumstantial evidence was correct. Furthermore, as appellants have specifically elected not to provide a complete record of the evidence presented at trial, it is impossible for this court to definitively determine whether any such circumstantial evidence was relied on by the plaintiffs. Accordingly, based upon the record before us, the use of this particular standard instruction was not erroneous. Jackson v. West Jefferson Hospital, 245 So.2d 724 (La.App. 4th Cir.1971).
Appellants argue that the trial judge erred in giving several instructions to the jury that an individual cannot recover for injuries caused by pesticides if that individual is sensitive or allergic to pesticides.
A review of the record in the instant case reveals that no evidence was presented nor was it contended that plaintiff, Gayle Laborde, was unusually sensitive to pesticides. Rather, appellants contended that Mrs. Laborde developed a chemical sensitivity because of her alleged repeated overexposure to the pesticides over a long period of time. Therefore, it is apparent that *1335 the error, if any, committed by the trial court in giving instructions relative to pre-existing condition of sensitivity did not prejudice the jury and thus constituted harmless error. This conclusion of harmless error is further supported by the finding of the jury that there was no causation between the application of pesticides and the alleged injuries. In other words, the allergies or sensitivities of the plaintiff are inconsequential without a finding of causation. Here, apparently, the jury did not find that the application of the pesticide caused any injury to Mrs. Laborde or any of the appellants.
In summary, the wording of the instructions is such that the crucial initial requirement is a finding that the application of the pesticides caused the injury suffered by the appellants. These instructions could not have in any fashion undermined the duty of the jury to consider the element of causation. Therefore, any error in the giving of these instructions was harmless. As we have concluded that these instructions, if erroneous, constituted harmless error, it is unnecessary for us to consider the accuracy or inaccuracy of the content of these instructions.
Appellants further argue that the instructions constituted reversible error due to their repetitious, unclear, incoherent, unordered and disjointed format. This argument is without merit.
While a review of the jury instructions reveals that they were lengthy and unorganized, when viewed as a whole, the instructions were adequate and reasonably effective in guiding the jury on the law relevant to this particular case. Most importantly, the instructions provided the jury with a sufficient understanding of the law regarding plaintiffs' burden of proof and causation. The instructions in the instant case did not act to deprive plaintiffs' of a meaningful jury trial and enabled the jury to reach a verdict which is fully supported by the evidence, which will be discussed below.

JURY MISCONDUCT
Appellants argue that under the circumstances of a long and complex trial that the jurors committed misconduct by returning an unreasonably quick verdict after only deliberating approximately twenty minutes, contrary to the court's instructions to consider all of the law and evidence and therefore the verdict must be set aside.
It is well-settled that improper behavior of a jury is not specifically defined by statute or jurisprudence but must be determined by the facts and circumstances of each case. A new trial is mandated only upon a showing of jury misconduct which is of such a grievous nature as to preclude the impartial administration of justice. See LSA-C.C.P. Arts. 1814, 1971, 1972 and 1973, Bossier v. Desoto General Hosp., 442 So.2d 485 (La.App. 2d Cir.1983), writ denied, 443 So.2d 1122 (La.1984), Bourgeois v. Bill Watson's Investments, Inc., 458 So.2d 167 (La.App. 5th Cir.1984) and citations therein.
Certainly, jury misconduct cannot be presumed solely from the length of time that a jury deliberates. See Trascher v. Roussel, 221 So.2d 311 (La.App. 4th Cir. 1969). It would be pure speculation for this court to consider what actions the jurors took during their deliberations or the factors they considered in reaching their verdict. Therefore, this argument is without merit.
As we have determined that the jury instructions were satisfactory and the alleged erroneous instructions constituted harmless error and the jury was not guilty of misconduct, it is appropriate for this court to review the evidence contained in the record to determine whether the jury verdict is manifestly erroneous.
It is well-settled that:
"... (w)hen there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated *1336 another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable."
Canter v. Koehring Company, 283 So.2d 716 (La.1973) at 724. See also Doss v. Hartford Fire Ins. Co., 448 So.2d 813 (La. App. 2d Cir.1984), writ denied, 450 So.2d 359 (La.1984), Robillard v. P & R Racetracks, Inc., 405 So.2d 1203 (La.App. 1st Cir.1981) and Ray v. Ameri-Care Hospital, 400 So.2d 1127 (La.App. 1st Cir.1981), writ denied, 404 So.2d 277 (La.1981).
The determination of causation is a question of fact which is entitled to great weight on appeal and should not be disturbed in the absence of manifest error. Rivet v. State, Through Dept. of Transp., 434 So.2d 436 (La.App. 3rd Cir.1983), Belmon v. St. Frances Cabrini Hosp., 427 So.2d 541 (La.App. 3rd Cir.1983) and numerous citations therein.
The record before this court clearly demonstrates the verdict of the jury was not manifestly erroneous and was fully supported by the evidence.
The majority of the medical experts testified that the levels of pesticides found in Mrs. Laborde's blood sample and samples from the home were not medically significant. Further, the testimony of the experts established that there are classic, recognizable symptoms of poisoning by organochlorine and organophosphate pesticides. The symptoms include a fairly violent reaction accompanied by convulsions in the case of organochlorine exposure and pulmonary edema, profuse sweating, muscle twitching and possible respiratory failure in the case of organophosphate poisoning. The evidence reveals that plaintiff, Gayle Laborde, was closely monitored by physicians and underwent numerous, extensive medical evaluations in various medical specialties for a significant period of time before the instant action was commenced. While plaintiff did have several serious medical problems, the physical symptoms or evidence of the syndrome particular to pesticide poisoning is noticeably absent from plaintiff's medical history. The testimony indicated that these symptoms would be present whether the overexposure occurred from a large, toxic exposure or repeated low level exposure. The majority of the experts testified quite emphatically that there was no evidence that plaintiff had ever suffered from pesticide overexposure. The testimony was clear that it was unlikely that plaintiff suffered an overexposure from the chemical spill on her patio. This was supported by the testimony of Dr. Thore who saw plaintiff shortly after the alleged overexposure and the physical examination at that time was normal. Further, the testimony established that the pesticides are quickly metabolized by the body and that there are very few known residual effects from overexposure. The diagnosis of neuropsychiatric syndrome secondary to pesticide overexposure and porphyria made by plaintiff's expert, Dr. Alexander, was rebutted by the other medical experts. The testimony indicated that medical tests did not reveal the presence of porphyria nor was neuropsychiatric syndrome recognized as a specific diagnosis in either the field of psychiatry or neurology.
The psychiatric testimony, including objective psychological testing, clearly established that plaintiff was suffering from an emotional disorder, the onset of which occurred considerably well before the period of the alleged overexposure to pesticides. The disorder was commonly diagnosed as hypochondriasis or somatization disorder accompanied by depression and anxiety. Briefly stated, plaintiff tended to focus on her bodily symptoms and tended to somatize or convert her emotions or stress into physical symptoms.
Apparently, plaintiff is now undergoing a type of "isolation therapy" in which she lives in a specially equipped, chemical free cottage so as to avoid further pesticide exposure, with drastic lifestyle changes such as the use of oxygen and special air filters. The majority of the experts agreed that such measures were unnecessary and *1337 most likely deleterious to plaintiff's condition.
In summary, the overwhelming thrust of the expert testimony in the record before us supports the conclusion that the plaintiff's physical symptoms were not caused by pesticide poisoning. As was noted hereinabove, certain portions of the record, including the testimony of the plaintiff and that of her primary treating physician, Dr. William Rea, were not designated by the appellants as part of the record on appeal. Notwithstanding the presumption that this testimony would support the judgment of the trial court, the testimony in the record was so overwhelmingly contrary to the plaintiffs' position, it is extremely doubtful that the inclusion of this testimony would have altered the findings of this court.
For these reasons, the judgment of the trial court in favor of defendants, Velsicol Chemical Corporation, Ralph Bernard, d/b/a AAA Pest Control Company, Dow Chemical Corporation, Stephenson Chemical Company, Ciba-Geigy Corporation, Mutual Fire, Marine and Inland Insurance Company, Interstate Fire and Casualty Company and Home Indemnity Insurance Company and against plaintiffs, P.J. Laborde, Jr., Individually and as the tutor of the minor child, Ann Laborde, Gayle Laborde, David Laborde, P.J. Laborde, III and Jeanne Laborde and against intervenor, Board of Trustees, State Employees Group Benefits Program is affirmed. Costs of this appeal are assessed equally between plaintiffs and intervenor.
NOTES
[1] The judges of the Third Circuit Court of Appeal were recused in this case. By order of the Supreme Court dated February 5, 1985, a panel of judges from the Second Circuit Court of Appeal was appointed to act as judges ad hoc of the Third Circuit Court of Appeal to hear this matter.
[2] This examination was conducted shortly after plaintiff was allegedly exposed to a chemical spill on the patio of her home.