530 So.2d 1282 (1988)
Deborah Hanson FULLER, Individually and as Provisional Tutrix of the Minor, Jay Brian Fuller, Plaintiff/Appellee,
v.
UNITED STATES AIRCRAFT INSURANCE GROUP, Defendant/Appellant and
Chicago Insurance Company, Defendant/Appellee.
No. 19,805-CA.
Court of Appeal of Louisiana, Second Circuit.
August 17, 1988.
Rehearing Denied September 15, 1988.
*1283 McGlinchey, Stafford, Mintz, Cellini & Lang, New Orleans by Kenneth H. LaBorde, for U.S. Aircraft Ins. Group.
Lunn, Irion, Johnson, Salley & Carlisle, Shreveport by Frank M. Walker, Jr., for Commercial Union Ins. Co.
Nelson, Hammons & Johnson, Shreveport by Sydney B. Nelson, for Deborah Hanson Fuller.
Bodenheimer, Jones, Klotz & Simmons, Shreveport by J.W. Jones, for Chicago Ins. Co.
*1284 Before MARVIN, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
This is a suit for wrongful death resulting from the crash of a private Beech Bonanza A36TC airplane. The plaintiff's decedent, Doug Fuller, was a passenger in Blanco Oil Company's plane that crashed shortly after takeoff on May 28, 1981. The litigation encompassed many parties and incidental actions, but by the time the case went to the jury after a long trial, the only remaining defendants were Blanco Oil's primary insurer, United States Aircraft Insurance Group ("USAIG"), and its umbrella insurer, Chicago Insurance Company ("Chicago"). The jury rendered verdict in favor of the plaintiff and assessed 57% of the fault to the defendants' insured, Blanco Oil, and Blanco's president, Mr. Joe Bob White. The jury set damages slightly in excess of $1,000,000, including $400,000 and $200,000 to Mrs. Fuller and her minor son respectively for loss of support. After rendition of verdict but before entry of judgment, the claims against Chicago were settled, leaving only USAIG cast for White's and Blanco's portion of the damages. USAIG has appealed, and Mrs. Fuller has answered the appeal, raising the following issues:
(1) Was the jury clearly wrong in finding that Mr. Fuller was an independent contractor for, rather than an employee of, White or Blanco?
(2) Was the trial court's jury charge as to distinguishing between an independent contractor and an employee unclear? and
(3) Was the award of $600,000 for loss of support inadequate?
Concluding that USAIG's arguments have merit, we reverse and render.

FACTS
In the late 1970s Joe Bob White, an oil man of long standing, started a number of companies in the petroleum business. His oil development company, White & Bancroft, was in the business of exploring for oil and drilling wells. Blanco Oil was established to operate and manage the completed wells. Banjo Inc. was to provide oilfield services. These entities were closely allied and were practically White's alter ego. Most of their activities were in a field near Haynesville. Although White was quite knowledgeable about the oil patch, he was not himself a petroleum engineer.
In early 1980 White announced he would be hiring his "close friend," Doug Fuller, as petroleum engineer. White had known Fuller for several years, since Fuller had been in college and engaged to White's daughter's roommate. White apparently agreed to hire Fuller after he completed his term in the air force in 1980. Several witnesses testified that Fuller, the younger man, looked to White as a "second father." Starting in February 1980, Fuller worked, without a written contract, for White's companies in Shreveport and at the Haynesville field, and for no one else. Mrs. Fuller testified that White's enterprises kept her husband very busy during this time. White paid Fuller a specified semimonthly sum (at the time of his death it was $1,500 twice a month) with no withholdings for income taxes or FICA. He also did not pay unemployment tax for Fuller. Fuller filed tax returns as a selfemployed professional person, submitting quarterly estimates for income tax and self-employment tax.
In most other respects, however, the arrangement appeared to be a typical employment relation. White provided Fuller with office space, supplies and secretarial help without requiring reimbursement. He also provided free of charge a car, auto insurance and gas company credit card. White even carried Fuller on Blanco's hospitalization plan and provided him life insurance at no charge. At the same time White was also carrying several employees of an unrelated company, Lu-Chem, on Blanco's hospitalization plan, but this was for the latter's convenience and with the clear understanding that Lu-Chem was to repay White in the future. The premiums were in fact repaid. Fuller put in regular hours and worked very closely with White. As to the nature of Fuller's work, Blanco's secretary-treasurer, Mr. Ferguson, testified that *1285 although Fuller's work was result-oriented, White retained the primary responsibility and authority as to what was done and when. R.p. 1896.
In early 1981, Fuller's actual father, an operations manager for Gulf Oil, gave Fuller a lead on some subleases in Midland, Texas, that Gulf was about to let. Fuller passed on this information to White; it represented a potentially profitable expansion that they wanted to explore. Blanco bought a used Beech A36TC to facilitate travel. White was a certified pilot but had not flown in over three years, except for a biennial recertification session with flight instructor Gene Rosa a few days before the fatal crash. Fuller was also a certified pilot, having flown a KC135 in the air force, but he never flew Blanco's Beechcraft. On May 28, 1981, White and Fuller boarded the plane to fly to Midland. Apparently White was the pilot and Fuller was in the front; Blanco's rig superintendent and his wife, Mr. and Mrs. McDonald, were passengers in the rear. They took off from Shreveport downtown airport, Runway 23, at 8:32 that morning.
Shortly after takeoff the pilot radioed the tower that his cockpit door was open and he needed to land the craft. Permission was granted to return to Runway 23 and the airplane began a turnaround maneuver that appeared somewhat irregular to the air traffic controllers, who radioed him that he could return to either Runway 23 or Runway 14. Two or three times they advised him to watch his altitude. The plane stalled at about 500 feet and crashed in a field one-half mile northwest of the airport, killing all the occupants.
Mrs. Fuller brought suit individually and on behalf of her minor son, Jay Fuller, who was only a few months old at the time of the accident. As noted, she sued USAIG and Chicago, the insurers of Blanco and Joe Bob White. She also sued Beech Aircraft Company, alleging the company had known for years that its cockpit doors did not close satisfactorily, thus creating a hazard especially at takeoff; and Gene Rosa's insurer, Employers Casualty Company, alleging that Rosa's recertification flight did not adequately address emergency procedures. There were numerous incidental demands, notably the intervention of Commercial Union, Blanco's workers comp carrier; Mrs. Fuller had brought a separate suit against Commercial Union in the event her husband was determined to have been Blanco's employee. As noted, all claims were settled except the principal demand against USAIG and Chicago, reducing the issues to Fuller's status as an employee or independent contractor; the allocation of fault, if any, to White and Fuller; and quantum.
The jury found that Fuller was an independent contractor for Blanco and therefore not confined to the exclusive remedy of workers compensation. The jury allocated fault as follows:

Joe Bob White 57%
Gene Rosa 27
Beech Aircraft 16
Doug Fuller 0

The jury set damages at $1,000,000, including $600,000 for loss of support and $400,000 for loss of love and affection. Funeral expenses were also awarded.
Chicago settled with Mrs. Fuller before the verdict was reduced to judgment. The court rendered judgment against USAIG for $570,000 plus 57% of funeral expenses. From this judgment USAIG has appealed and Mrs. Fuller has answered the appeal.

JURY INSTRUCTIONS
By its second assignment USAIG contends the trial court failed to explain the significance of the various factors to be weighed by the jury in deciding whether Fuller was an employee or an independent contractor. Fuller's status was the most important issue at trial and any deficiency in the instructions, according to USAIG, would mandate setting aside the verdict. We have considered this assignment first because of the effect of erroneous instructions on the standard of review; a verdict based on instructions that were faulty in a critical regard need not be bound by the manifest error rule. Laborde v. Velsicol Chem. Corp., 474 So.2d 1320 (La.App. 3d *1286 Cir.1985), writ denied 480 So.2d 738 (La. 1986).
Adequate jury instructions are those that fairly and reasonably point up the issues and provide correct principles of law for the jury to apply to those issues. Sparacello v. Andrews, 501 So.2d 269 (La. App. 1st Cir.1986), writ denied 502 So.2d 103 (La.1987); Laborde v. Velsicol Chem. Corp., supra; Lincecum v. Missouri Pacific R. Co., 452 So.2d 1182 (La.App. 1st Cir. 1984), writ denied 458 So.2d 476 (La.1984). The trial judge is not required to give the precise instructions submitted by the litigants; he need only give instructions that properly reflect the applicable law and adequately convey the issues to the jury. LSA-C.C.P. art. 1792; Schoonmaker v. Capital Towing Co., 512 So.2d 480 (La. App. 1st Cir.1987), writ denied 514 So.2d 458 (La.1987); Marler v. Rent-It Co., 490 So.2d 784 (La.App. 3d Cir.1986). Even if the requested instructions are fair statements of the law, the trial judge need not include them verbatim but must strike a fair balance so that no one issue is unduly emphasized. Wilson v. Aetna Cas. & Sur. Co., 401 So.2d 500 (La.App. 2d Cir.1981); Folse v. Fakouri, 371 So.2d 1120 (La.1979).
USAIG argues the trial judge's charge did not precisely instruct the jury how to weigh its findings and properly apply them to reach the correct legal conclusion. USAIG's proposed jury charge No. 15 begins by instructing the jury to balance eleven listed factors which bear on the degree of control that White had the right to exercise over Fuller. Each factor contains a statement that would support a finding of employee status but begins with the conjunction "whether," to indicate alternative conditions. For instance, the second factor reads, "Whether the services performed by Fuller were an integral part of Blanco Oil Company's business." Each of the factors is similarly phrased. The instruction then advises that an affirmative finding weighs in favor of an employment relationship, and finally notes the jury should consider the total economic relationship between the parties.
The plaintiff's proposed jury charge is similar to USAIG's. It lists eight factors and each is followed by a long explanation of the precise manner of weighing the evidence. For instance, the seventh factor is entitled "Nature of the Business" and reads as follows:
7. Nature of the Business

If you find that the nature of the business or occupation of the person performing the services is independent of the nature of the principal's business, an independent contractor/principal relation is indicated.
As noted, each of the factors carries a similar explanatory instruction.
By contrast, the court's actual charge does not provide a point-by-point recitation of how each factor should be weighed, even though the parties either submitted this type of explanation or a general instruction that clarified the weighing. The court's charge begins by quoting LSA-R.S. 23:1021 to say that a contractor renders service for a specified price or a specified result under control of the principal as to results only and not as to means. It further states that each case must be decided on its own particular facts. This fairly and reasonably states the law. Sones v. Mutual of Omaha Ins. Co., 272 So.2d 739 (La. App. 2d Cir.1973), writ denied 273 So.2d 292 (La.1973); Amyx v. Henry & Hall, 227 La. 364, 79 So.2d 483 (1955).
However, when the instruction addresses how to weigh the factors, it becomes unclear. There is a general instruction which states:
It is not necessary that all of these elements be present in every case to render a person who performs service for another an independent contractor; nor is the absence of any element to be considered decisive. You are to consider the overall relationship between the parties, and the elements listed above are intended to give you guidance in that respect only.
The very first factor shows the difficulty. It reads:
(1) The degree of control exercised by the principal over the work performed.
*1287 The "degree of control" is obviously a sliding scale; the greater the control, the more likely an employment relation. "Control" is not an element that is either present or absent; it is present to a greater or lesser degree. If a great degree of control is present, however, then this would not render the worker an independent contractor, as the general instruction would suggest. We are constrained to conclude that the trial court's first factor is not clearly stated to conform to the general instruction, and even if it could be clarified by the jury, it would imply the wrong conclusion.
The same kind of confusion riddles the other factors as well. Factor No. 4 refers to:
(4) The manner in which the worker is carried on the payroll of the principal.
The "manner" of payment is like the "degree" of control; it is neither present nor absent. The phrasing of the factor does not correspond to the general instruction, and offers no guidance whatsoever as to the weighing of the evidence. Factor No. 6, referring to the "source of the materials used by the worker," suffers from the same lack of clarity.
Even more disturbing, however, is the erroneous implication provided by Factors Nos. 7 and 8. They provide as follows:
(7) Whether the worker performing the services is an integral part of the principal's business or whether he is independent of the principal's business.
(8) Whether a person performs work for a principal on a continuing and exclusive basis.
The positive assertion of these factors is that a worker is performing services integral to the principal's business and that he is performing work on a continuing and exclusive basis. The general instruction indicates that if these factors are present, a finding of independent contractor is justified. This conclusion is plainly wrong. Performing work that is an integral part of the principal's business is indicative of employment status. Durant v. Industrial Lumber Co., 6 So.2d 164 (La.App. 1st Cir. 1942); cf. LSA-R.S. 23:1035. Likewise, performing work for the principal on a continuing and exclusive basis is indicative of employment. Sones, supra; Malone & Johnson, 13 La. Civil Law Treatise (Workers' Compensation) § 74 (1980, with 1987 p.p.).
We have reviewed the remainder of the factors to see if perhaps all of them were simply stated backwards, making assertions that implied employee status. However, Factors Nos. 3 and 5 provide:
(3) Whether the worker renders service for a specified price to be paid for a specified result either as a unit or as a whole.
(5) The right by the worker, whether exercised or not, to hire helpers and assistants.
In both instances, the positive assertions (that work is done for a specified price per unit or whole, and the worker has the right to hire helpers) are indicative of an independent contractor situation. LSA-R.S. 23:1021(6); Malone & Johnson, op. cit., § 79. Thus the presence of these factors would substantiate a finding of the contractor relationship, as the general instruction suggests.
In summary, the manner in which the factors are stated creates considerable confusion as to the proper assessment of the evidence. Some of them apply directly; some of them do not conform to the general provisions; and some squarely lead to the wrong conclusion. In this state of affairs, we could not reasonably hold the instructions "adequate" on this most crucial aspect of the case.
We realize that factors as such are subordinate to the overall consideration of the "total economic relationship" of the parties. We are reluctant to hold jury instructions inadequate. However, given the sparsity of evidence as to the exact nature of White and Fuller's relationship, the individual factors must assume a greater significance. We cannot avoid the conclusion that they were unclear enough on the critical issue to mislead the jury.
We would also note an omission from the trial court's charge. USAIG requested instructions *1288 as to the fringe benefits that Fuller received from White. The evidence showed that these benefits were considerable and were a significant element of the "overall economic relationship" between the parties. Sones, supra. The trial court declined to give this instruction. The instructions should encompass the applicable facts. Lincecum v. Missouri Pacific R. Co., supra; Reeder v. Allstate Ins. Co., 235 So.2d 111 (La.App. 4th Cir.1970), writ denied 256 La. 615, 237 So.2d 397 (1970); Miller v. Fogleman Truck Lines, 398 So.2d 634 (La.App. 3d Cir.1981), writ denied 401 So.2d 358 (La.1981). We feel the instructions should have conformed to this significant aspect of the case.
The trial judge remarked that he rejected USAIG's proposed charge because it worded the factors in such a way that the jury might infer a preference on the court's part and that this encroached on the prohibition against commenting on the evidence. LSA-C.C.P. art. 1791; R.p.p. 1939-1940. The court's caution was well taken, but the pursuit of neutrality resulted in an instruction that is partly unclear and partly incorrect. It did not fairly and reasonably provide correct points of law to be applied to the issues and facts. Laborde v. Velsicol Chem. Corp., supra. The court could have avoided this error by applying the logical and well-organized format of either of the proposed jury charges. This assignment of error has merit. We have therefore examined the evidence under the appropriate legal standard to determine whether it proves an employee or independent contractor status.

CONTRACTOR STATUS
By its first assignment of error, USAIG contends the preponderance of evidence adduced at trial clearly established that Fuller was an employee of Blanco or White, and thus the evidence does not support the jury's verdict of contractor status. USAIG characterizes the evidence in favor of employee status as "overwhelming."
Under the usual standard of review, an appellate court should not disturb the factfinder's finding of fact, when the factfinder has made a reasonable evaluation of credibility and the evidence furnishes a reasonable basis for the finding, in the absence of manifest error. Canter v. Koehring Co., 283 So.2d 716 (La.1973). However, when the jury instructions are misleading and unclear on a crucial issue, as in the instant case, the appellate court must review the evidence essentially de novo, making a fair determination based on the record evidence. Lincecum v. Missouri Pacific R. Co., supra; Laborde v. Velsicol Chem. Corp., supra. We conclude that the evidence contained in this record is sufficient to support a judgment under the correct legal principles, thus obviating the need for remand for a new trial.
The primary source of law is the workers compensation statute, which defines an independent contractor as:
any person who renders service, other than manual labor, for specified recompense for a specified result, either as a unit or as a whole, under the control of his principal as to the results of his work only, and not as to the means by which such result is accomplished. LSA-R.S. 23:1021(6).
The statute further provides:
A person rendering service for another in any trades, businesses or occupations covered by this Chapter is presumed to be an employee under this Chapter. * * * LSA-R.S. 23:1044.
We acknowledge dicta in two cases to suggest that when an injured worker files suit alleging contractor status, a different presumption might perhaps apply. Allgood v. Loeb, 22 So.2d 568 (Orl.Cir.1946), rev'd 210 La. 594, 27 So.2d 380 (1946); Sones v. Mutual of Omaha, supra. One noted commentator disagrees, stating that even if the claimant asserts he is a contractor, he must apparently overcome the statutory burden. Malone & Johnson, op. cit., § 85; see also Maurice v. Orleans Parish Sch. Bd., 295 So.2d 184 (La.App. 4th Cir. 1974). Given the humanitarian objective of the statute to cover as many workers as possible, and the compromise of relinquishing the tort remedy for claimants, we are *1289 inclined to apply R.S. 23:1044 to this case, in accord with Prof. Johnson's analysis.
The term "independent contractor" connotes a freedom of action and choice with respect to the undertaking in question as well as a legal responsibility on the part of the contractor in case the agreement is not fulfilled in accord with its covenants. Hickman v. Southern Pac. Transp. Co., 262 La. 102, 262 So.2d 385 (1972). The inquiry to determine whether a relationship is that of independent contractor or of employment hinges on a principal test: the control over the work reserved by the principal. The amount of supervision and control actually exercised is not the crucial question, but rather the amount of supervision and control reserved by the principal from the nature of the relationship. Amyx v. Henry & Hall, supra. Each case must be decided on its own facts, taking into special consideration the total economic relationship between the parties. Sones v. Mutual of Omaha, supra; Shepherd v. Martin, 448 So.2d 223 (La. App. 1st Cir.1984).
As a guide to analyzing the evidence in particular cases, this court has taken into account various factors that weigh either against or in favor of an employment relationship. Sones, supra, 272 So.2d at 742. At trial of the instant case, the parties both submitted a list of factors synthesized from Sones and from Hickman, supra, and Amyx, supra. The trial court adopted eight of these suggested factors, to which appellant objected not because they were inapplicable but because they were incomplete and lacked adequate explanation. Appellant's objections were meritorious, as already discussed, but for the sake of convenience we have adapted the trial court's listing of factors to our discussion, making the necessary changes and additions to show how each one bears on the critical issue of control.
The salient features of the total economic picture include the fact that Fuller performed valuable professional services for White, and these services were an important part of White's business; although White could not ultimately dictate the means of Fuller's work, he had total authority to assign and direct work; he appeared to work very closely with Fuller; there was no written contract but there was a definite payment scheme; Fuller was almost totally financially dependent on White, who apparently had the right to discontinue Fuller's services without notice; and Fuller worked exclusively for White for 16 months, from early 1980 until the accident. This overview would suggest that White retained significant control over Fuller in the business enterprise.
The proof in this case was difficult because both of the people involved were obviously unavailable to offer their perceptions of the relationship or to describe accurately how they transacted business together. We feel this dearth of evidence underscores the importance of the factors, which we have analyzed as follows:
1. The degree of supervision and control actually exercised by the principal over the work performed. As already noted, this factor is highly indicative of reserved control. Sones v. Mutual of Omaha, supra; Hemphill v. State Farm Ins. Co., 472 So.2d 320 (La.App. 3d Cir.1985). In accord with R.S. 23:1021, courts have held that control over the end result, without the right of supervising the manner in which the work is performed, is suggestive of an independent contractor relationship. Lushute v. Diesi, 354 So.2d 179 (La.1977); Kamm v. Morgan, 157 So.2d 118 (La.App. 4th Cir.1963).
Mr. Ferguson testified that everyone in Blanco's "close knit operation" looked primarily to White for supervision or guidance in his job duties and that White had "primary responsibility" over the work. R.p. 1896. While Mr. Ferguson once described Fuller's work as "result oriented," R.p. 1910, this was not the thrust of his testimony. A passage cited by appellants in brief underscores the ambiguity.[1] Ms. McMullen *1290 testified that White usually knew what Fuller was doing and that Fuller would have done whatever White wanted him to do. R.p. 903. By seeking to know the whereabouts and doings of Fuller so constantly, White was almost certainly endeavoring to exercise a considerable degree of control over him. As a successful entrepreneur, White appeared to keep close tabs on everyone in his organization.
In sum, Mr. Ferguson's testimony on this point was somewhat equivocal but viewed together with the overall picture of the relationship as described by Mrs. Fuller and Ms. McMullen, the whole must support a finding of employee status.
2. Whether the work undertaken can be discontinued or terminated at any time by either party and without a corresponding liability for its breach. The right to terminate a worker's services at will is indicative of economic control on the principal's part and is antagonistic to the independent nature of the contractor's business. Hickman v. Southern Pac. Transp. Co., supra, 262 So.2d at 391. The principal's arbitrary decision to dishonor an existing contract would expose him to liability for breach of contract. See A. Larson, Workmen's Compensation, desk ed. § 44.35 (1985). An employer's arbitrary decision to fire an employee would be without major consequence, except perhaps for unemployment compensation. LSA-R.S. 23:1601.
The testimony on this factor was fairly clear. Ms. McMullen testified that White could have released Fuller at any time and that Fuller could have left. R.p. 912. Mr. Ferguson testified likewise, noting that Fuller, unlike himself, did not have a written contract declaring that he would be self-employed. R.p. 1910. Mrs. Fuller testified that her husband could not have just "upped and left," because this would violate both his moral obligation to White and her impression of their verbal agreement. However, she stated otherwise in a deposition prior to trial. R.p.p. 1580, 1581. She never offered any other details of this alleged agreement, and she made no statement as to White's right to terminate Fuller. On the whole, this evidence leads us to conclude that White and Fuller's arrangement was terminable at will. Mrs. Fuller's single remark as to her husband's obligation to White is easily outweighed by the other testimony and supports a finding of employment status.
3. Whether the worker renders service for a specified price to be paid for a specified result either as a unit or a whole. R.S. 23:1021(6). To support independent contractor status, the contract must call for a specific piecework as a unit to be done according to the contractor's own methods, at a specified price and for a specified time. Amyx v. Henry & Hall, supra, 79 So.2d at 486. Payment on a time basis is a strong indication of the status of employment, whereas payment on a completed project basis is indicative of independent contractor status. Larson, op. cit. § 44.33. There was no documentation of any agreement for a specific undertaking as a unit or a whole, or for any specific amount of work to be performed together, and no invoices claiming payment for a specified period of time. According to Mr. Ferguson, Fuller never did a specific parcel of work, but rather performed both office duties and field duties, depending on "what we had going on at the time." R.p. 1903, 1895. There was nothing to rebut the documentary evidence and direct testimony that Fuller was being paid on a regular time basis to perform whatever tasks White directed in the furtherance of the business. This factor supports a finding of employee status.
4. The manner in which the worker is carried on the payroll of the principal. If the worker is carried on the principal's payroll as an employee, then an employment relationship is indicated. White paid Fuller from his personal account, or from the Blanco Special Account, under entries labeled "Engineering Services" or "Professional Fees." White did not withhold federal *1291 or state income tax and did not pay FICA or unemployment tax for Fuller. Standing alone, this would not disprove employee status. See Suhor v. Medina, 421 So.2d 271 (La.App. 4th Cir.1982). However, Fuller's own records corresponded with White's payment scheme. He submitted quarterly returns based on estimated tax and paid self-employment tax, listing petroleum engineering as his business. If Fuller had considered himself an employee, he probably would have requested White to give him the benefit of the lower FICA rate and the freedom from quarterly payments. Fuller would not have assumed the added expense and inconvenience unless he thought it reflected their business relationship. Admittedly, the payroll arrangement could be explained by saying that White did not need the business deductions. R.p. 1899. In Sones, supra, the plaintiff's decedent was paid similarly to Fuller and was nevertheless determined to be an employee. However, on the whole, this factor weighs in favor of independent contractor status.
5. The right of the worker, whether exercised or not, to hire helpers and assistants. No evidence was produced as to the right to hire, although Fuller unquestionably did not hire any and appeared to use Blanco's and White's staff. Since he did not contract for a specific job at a specific price, we question whether he could have hired anyone on the pay he was receiving.
6. The source of the materials and equipment to be used by the worker. When the principal provides valuable equipment, the relationship is usually one of employment. Hickman v. Southern Pac. Transp. Co., supra, 262 So.2d at 390; Larson, op. cit., § 44.34. The evidence showed that White provided Fuller with a car and auto insurance, just like the plaintiff in Hickman, who was determined to be an employee. Moreover, White provided office space in American Bank Tower without charge, as well as secretarial and clerical assistance. R.p.p. 901, 902. Most of Fuller's business expenses were either advanced or reimbursed by White. This evidence overwhelmingly shows that Fuller was merely using White's means of production, as an employee typically does.
The appellees introduced Fuller's 1980 Schedule C income tax return, showing a small deduction for office supplies. Fuller's accountant, Mr. Thomas, explained that many of the deductions usually taken by businessmen were simply not applicable to Fuller because he had been in business only a short time and did not yet have a staff or major expenses. R.p. 853. However, the majority of Fuller's expenses were reimbursed by White or Blanco in the fashion of ordinary employment. R.p. 1901. We are also constrained to note that the 1980 Schedule C was filed after the tragic accident, when litigation may have been anticipated. The overall weight of the evidence shows convincingly that White supplied the material, equipment, supplies and clerical help used by Fuller. This factor supports a finding of employee status.
7. Whether the worker performing the services is an integral part of the principal's business or whether he is independent of the principal's business. Independent contractor status presupposes the independent nature of the worker's business and is not exclusive as to the means whereby it is accomplished. Amyx v. Henry & Hall, supra, 79 So.2d at 486. Ms. McMullen, testifying for appellee, conceded that Fuller's services were "vital" to the business, R.p. 903, and Mr. Ferguson, testifying for USAIG, called them "essential." R.p. 1894. In fact, Mr. Ferguson specifically referred to Fuller's services as a "part of the business." In light of this testimony, it would be specious to say that White could not have directed Fuller in regard to the particulars of the operation. Amyx v. Henry & Hall, supra, 79 So.2d at 487. We must reject appellee's contention in brief that Fuller's work was "independent of and separate from" Blanco's business.
Appellee has stressed Fuller's specialized, technical training as indicative of his independence from White's enterprise. We agree that a professional person is more likely than a laborer or a clerical worker to serve as an independent contractor. However, a professional person's status is not automatically ascertained. See Ducote v. *1292 Albert, 503 So.2d 85 (La.App. 5th Cir.1987), aff'd 521 So.2d 399 (La.1988), holding that summary judgment is not a proper vehicle for determining a company doctor's status. In affirming Ducote, the supreme court plainly stated that a company doctor or plant physician is not an independent contractor for all purposes as regards the workers comp law. 521 So.2d at 400. Rather, the circumstances of the case are determinative. See also Suhor v. Medina, supra. The evidence plainly shows that Fuller's services as a petroleum engineer were both essential to and a part of White's petroleum business, and thus subject to the latter's control.
Appellee further argues that White engaged a number of professional people, such as the C.P.A., Mr. Thomas, for technical services essential to the business. Mr. Thomas, however, maintained an independent business entity, separate offices and his own staff. Fuller did not. The fact that White hired other people who would appear to be independent contractors does not alter the predominant evidence that Fuller was an employee. The evidence bearing on this factor supports a finding of employee status.
8. Whether a person performs work for a principal on a continuing and exclusive basis. In Sones, supra, this court attached "particular significance" to the fact that the plaintiff's decedent rendered services to the defendant on a continuing and exclusive basis; this evidence was strong enough to overcome many indicia of contractor status because it suggested the worker's dependence on the principal. Simply put, a person who performs services for one principal across an extended period of time is more likely to be an employee. The evidence is not disputed that Fuller worked exclusively and continuously for White from the beginning of 1980 until his death. Mrs. Fuller testified that White's projects kept her husband quite busy and that he had not yet found the time to set up an office or business with other clients, though he intended to do so. However, the 16-month history between White and Fuller provides nothing else on which to base this conclusion. Appellees argue the alleged "new business venture" involving the Midland field is evidence of Fuller's independence and his incipient contracting business.[2] We do not agree. It appears that when Fuller received information about the leases in Midland, he immediately involved White. This indicates that he needed White's support and viewed him as an employer. White allowed Fuller to purchase a considerably larger interest in a Midland well than in any of the Haynesville projects, but this is probably a reflection of the help that Fuller's father rendered in securing the leases, and is not different from Fuller's proprietary holdings in previous wells. This factor clearly supports a finding of employee status.
Several other points were developed at trial. The first of these is one we feel the court should have incorporated into the jury charge. It involved "perks" not directly connected with production, such as insurance coverage. Mr. Herrington, an insurance agent, testified that he included Fuller's salary in calculating the original premium estimate on Blanco's workers comp policy. Fuller's name did not appear on the final audit, which was prepared after the tragic accident. Carrying someone on a workers comp insurance policy is not an admission of employee status. Allgood v. Loeb, 210 La. 594, 27 So.2d 380 (1946).
The life and hospitalization insurance received by Fuller free of charge are much more persuasive of employment status. It seems elementary that the purpose of hiring contractors is to escape the costs of employee expenses; in fact, the compensation law usually tries to circumvent loopholes that would allow employers to evade their comp obligations. See LSA-R.S. 23:1061. By providing such lavish fringe benefits, White showed a willingness to assume employee costs that can only be *1293 equated with the perception that he was in an employment relation. We feel this is a valid consideration in the overall economic relationship between Fuller and White, and it strongly supports a finding of employee status.
Finally, there were two documents, a financial statement and a pilot record, on which Fuller listed himself as Blanco's employee. Standing alone, neither of these would be especially probative, but they were prepared under circumstances where Fuller would have had no motive to misstate his true status, and they correspond with the overwhelming weight of the evidence to show that Fuller perceived himself an employee of Blanco Oil.
In sum, all but one of the factors clearly support a finding of employee status. The evidence indicates a relationship of almost total economic dependence. As this court pointed out in Sones, such a finding equates with a substantial right of control on White's part. This degree of control is incompatible with the independence that is the hallmark of an independent contractor. Even though there was no direct evidence that White directed Fuller as to detail every day, the testimony bearing on the factors is so strong that it mandates a finding of employment status. The evidence is considerably stronger than in Sones. Given the overwhelming nature of the evidence, even under the standard of manifest error, we would be constrained to hold the verdict plainly wrong. And given the inadequacy of the jury instructions, we conclude a fortiori that the evidence preponderated to show that Doug Fuller was an employee of Joe Bob White.
We have also considered the evidence of the fast friendship and nearly filial relation between Fuller and White, questioning whether White's generosity might be more reflective of friendship and a desire to lend a helping hand than of desire to establish an employment relationship. Under the circumstances of the case, White's paternalistic leanings could probably explain one or two aberrant findings, such as providing office space and supplies for someone who was really an independent contractor. However, we are unable to stretch this speculative theory to counteract the wide array of facts that militate so inevitably in favor of employment. To do so would require us to disregard the plain impact of the overwhelming weight of evidence.
The evidence also shows, with remarkable clarity, that at the time of the accident, Fuller was an employee functioning in the course and scope of his employment with White, and the accident arose out of the course and scope of employment. LSA-R. S. 23:1031. The tragic plane flight was undertaken in pursuit of White's new project at the Midland field; from all appearances, Fuller was to work for him there in a manner similar to his work at Haynesville field. Fuller was exposed to the risk of the flight because of his employment for White. See Kern v. Southport Mill, 174 La. 432, 141 So. 19 (La.1932). The time and place of the flight were obviously contemplated by White. Whitney v. United States Fid. & Guar. Co., 373 So.2d 728 (La.App. 2d Cir.1979), writ denied 376 So.2d 320 (La.1979). Appellee's claims are subject to the exclusive remedies of the Workers Compensation statute, for which USAIG is not liable under its policy.
Because of our conclusion as to liability, we need not discuss the issue of quantum raised by appellee in her answer to appeal.

CONCLUSION
For the reasons expressed, the judgment of the trial court is reversed. Douglas Fuller was an employee of Joe Bob White and the accident arose out of, and during the course and scope of his employment for White. Appellee's remedy lies exclusively in workers compensation. Judgment is herebyrendered dismissing plaintiff's claims at her costs.
REVERSED AND RENDERED.

ON APPLICATION FOR REHEARING
Before MARVIN, NORRIS, LINDSAY, HALL and SEXTON, JJ.
Rehearing denied.
NOTES
[1] Q. Were there ever occasions when you heard Mr. White ask Mr. Fuller to take care of some task?

A. Usually he had a lot of discretion as to what needed to be done and when. Now, sometimes, yes, he would suggest to Doug that certain things needed to be done and Doug would proceed forthwith. R.p. 1896.
[2] Appellee cites as further evidence of Fuller's "new" status the "fact" that in early 1981, he began receiving paychecks monthly instead of semimonthly. Br., 31. This assertion is not supported by the evidence. Exhibit P-5 shows continued semimonthly checks throughout 1981.