565 So.2d 487 (1990)
Robert Alan BERRY, Plaintiff/Appellant,
v.
COMMERCIAL UNION INSURANCE COMPANY, et al., Defendants/Appellees.
No. 21512-CA.
Court of Appeal of Louisiana, Second Circuit.
June 20, 1990.
Rehearing Denied July 24, 1990.
*488 Nelson, Hammons & White by John L. Hammons and Nancy Griswold, Shreveport, for plaintiff/appellant.
Blanchard, Walker O'Quin & Roberts by Lawrence W. Pettiette, Shreveport, for defendants/appellees.
Before HALL, NORRIS and LINDSAY, JJ.
NORRIS, Judge.
The plaintiff, Robert Alan Berry, appeals a jury verdict and judgment in favor of the defendant, Wen Products Inc., in a products liability case. He urges the trial court applied the wrong law, gave improper jury instructions and allowed Wen to introduce inadmissible evidence. Because of the improper jury charge, he argues, the verdict is invalid and not subject to the manifest error rule; he seeks a judgment in his favor based on a de novo review of the record. He also urges that the jury's assessment *489 of damages was abusively low. Wen seeks affirmance but has filed an answer to appeal, urging in the event of reversal that certain expert testimony should have been excluded.
Berry's first assignment has merit in part; the trial judge improperly ruled in limine that the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq. ("LPLA"), applied to this case. Contrary to Berry's argument, however, the applicable pre-LPLA jurisprudence did indeed allow "state of the art" evidence as a defense in a case based on an alleged design defect. Nevertheless, the jurisprudence did not allow the factfinder to conduct a "risk/utility" analysis, and the instant jury charge included just such an instruction. This error, however, does not mandate reversal. After a thorough review of the record, we find the evidence insufficient to prove by a preponderance that the alleged defect caused Berry's injury. We therefore affirm the judgment. Because of this resolution, Berry's argument as to quantum and Wen's answer to the appeal are not considered.

The accident and injury
At the time of the accident, Berry, 21 years old, was working for Barton's Body Works doing auto paint and body repair. Though July 4, 1984 was a holiday, his boss (and friend) Jerry Barton telephoned early that morning and asked him to help with some work. Berry agreed. Jerry Barton had recently bought a building on Linwood Ave. and intended to partition some space for use as an office. Also helping that day was Jerry's uncle, Gene Barton, who brought along a step ladder and a Wen Model 960 portable circular saw. In the morning, Berry was handing Gene and Jerry pieces of lumber and paneling which they trimmed with the Wen saw and installed; by lunchtime a few pieces of paneling were in place. After lunch Berry noticed a piece of paneling was overlapping a stud and running into the space for a door. Berry testified that Jerry and Gene asked him to trim the panel; in an earlier deposition he said only Gene asked him. Berry went to the front room, which was being enclosed, to do this task.
The Wen saw was lying on the floor, with the blade pointed away from Berry. The lower blade guard was missing; according to Gene Barton, it had broken some years ago and he was unable to replace it. He testified he warned everybody about the missing guard, and that "everybody was warning everybody else," but Berry testified he did not hear the warnings. Berry also testified he did not notice that the guard was missing at the time; he "assumed" the saw was properly guarded. He had used circular saws before and had once read the owner's manual to his father's saw. The owner's manual for the Wen Model 960 advised the user never to "remove, tie off, or in any way permanently retract" the lower blade guard. Even though Berry is right handed, he picked up the saw with his left hand. He grasped it by the handle, his forefinger resting on the trigger. He walked to the step ladder, which was conveniently positioned for the job; presumably Jerry or Gene had left it there after putting up the oversize panel. He began to climb the ladder, intending to reach a suitable height, steady himself with his right hand, transfer the saw to his right hand and trim the panel. However, when he placed his foot on the second step, he slipped.
Berry did not precisely recall what happened in the next fleeting instant. Apparently he grasped for the stud, or perhaps the top of the ladder, with both hands, but he squeezed the trigger on the saw, activating it. The unguarded, spinning blade made contact with Berry's right hand on the palm side where the fingers meet the hand, resulting in a severe cut to three fingers.
Berry was taken to South Park Hospital; after some delay and no treatment he was transferred to Schumpert Medical Center. Dr. Ramey operated to repair several nerves and tendons and to close the lacerations. He released Berry two days later. Two subsequent operations were performed; the fingers were saved. Dr. Ramey testified that Berry sustained a permanent *490 disability of 17% in his right hand and 10% for his whole body. Berry testified that he still suffers numbness, pain and decreased flexion in the injured fingers, thus affecting his ability to work, engage in recreational pursuits and perform small personal tasks such as shaving and buttoning his shirts.
Despite the injury, Berry resumed working for Jerry Barton only a few days after the accident. Eventually Jerry went out of business. By the time of trial in February and March 1989, Berry was running his own auto paint business, admittedly out of his mother's garage. His income for several years of this self-employment was not fully documented. During this time he had married and, with his wife, was raising a family and buying a house. Berry nevertheless maintained that he now takes longer to do work tasks than before. His expert rehabilitation counselor, Dr. Galloway, testified that the injury would interfere with Berry's ability to do paint and body work and probably disqualify him from other jobs for which he was suited. Berry's economics expert, Dr. Melvin Harju, estimated the present value of Berry's lost earning capacity at about $600,000. A defense expert, Dr. Kenneth Boudreaux, noted that Berry was earning more since the accident than before; he testified that Berry sustained no lost earning capacity at all.
The technical evidence pertaining to the Model 960 circular saw is summarized below.

Action in the trial court
Berry filed this suit in March 1984, originally naming Barton's Body Works, its insurer and Wen as defendants. Later Wen's insurer and Gene Barton were added as defendants. Numerous incidental demands were made, but these are not essential to our discussion. Prior to trial, Berry settled with all defendants except Wen and its insurer. The major issue at trial was Wen's liability for manufacturing an allegedly defective saw, though the jury was specifically asked to consider the comparative fault of Wen, Gene Barton and Berry himself.
In response to an interrogatory asking whether Wen was at fault in this accident, the jury stated, "No." The jury assigned fault 40% to Gene Barton and 60% to Berry. It awarded $10,000 for past medical expenses (as instructed) and $1,800 for past lost wages. The jury awarded nothing for pain and suffering and lost earning capacity. Berry took this devolutive appeal.

Discussion: Berry's first assignment
By his first assignment, Berry urges the trial court erred in applying the new LPLA retroactively to the trial and decision of this case. According to Berry, the error manifested itself in two major ways: first, the court let Wen introduce evidence pertaining to the "state of the art" defense, which was not permissible prior to LPLA; and second, the court gave improper jury instructions that tracked LPLA. Though they do not ultimately present reversible error, these arguments merit some discussion.
The Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., took effect on September 1, 1988. It has no provision for retroactivity. LSA-Acts 1988, No. 64, § 2. The instant accident of July 1984 obviously occurred before that effective date; Berry sought in limine to try the case not under LPLA but under the rules announced in Halphen v. Johns-Manville Sales Corp., 484 So.2d 110 (La.1986). The trial court denied the motion, holding LPLA was retroactive.
Since the time of that ruling this court has held that LPLA affects substantive rights and is therefore prospective only. McCoy v. Otis Elevator, 546 So.2d 229 (La.App. 2d Cir.1989), writ denied 551 So.2d 636 (La.1989). Another court has also noted that LPLA does not apply to cases arising before September 1, 1988. See Breeden v. Valencia Inc., 557 So.2d 302 (La. App. 4th Cir.1990), writ denied 558 So.2d 607 (La.1990); Traut v. Uniroyal Inc., 555 So.2d 655 (La.App. 4th Cir.1989). The trial court's ruling in limine was wrong; LPLA does not apply to this case. Halphen applies.
*491 The first phase of Berry's argument urges that evidence as to a "state of the art" defense, though admissible under LPLA, was not admissible under Halphen. Under either Halphen or LPLA, the plaintiff to prevail must prove that his harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. See Halphen, supra at 113; R.S. 9:2800.54 A.
The court in Halphen discussed the caselaw and set down "classifications of unreasonably dangerous products." First was the class of products which are "unreasonably dangerous per se," meaning those whose danger-in-fact, whether foreseeable or not, outweighs the utility of the product. This weighing of danger, foreseeability and utility is called the "risk/utility" analysis. The court applied it to find that asbestos, which caused the plaintiff's husband's death, was unreasonably dangerous per se; thus the manufacturer's claim that it could not have anticipated the harm, even with "state of the art" knowledge, was irrelevant; evidence to that effect was inadmissible.
Second was the class of products which are "unreasonably dangerous in construction or composition" in that they contain an unintended abnormality or condition that makes the product more dangerous than it was designed to be. Weber v. Fidelity & Cas. Ins. Co. of N.Y., 259 La. 599, 250 So.2d 754 (1971), was this kind of case. Third was the class of products which, though not unreasonably dangerous per se or flawed by construction defect, are unreasonably dangerous because of lack of adequate warning to avert a danger not obvious to the ordinary user. Winterrowd v. The Travelers Indem Co., 462 So.2d 639 (La.1985), was this kind of case.
Finally there was the class of products which are "unreasonably dangerous because of design," and these fall into three categories. First are products whose design is unreasonably dangerous per se, based on the risk/utility test. In such a case, the manufacturer may not introduce evidence of whether it could have anticipated the danger and feasibly averted it. Second are products which, though not per se, are still unreasonably dangerous because alternative products were available to serve the same needs with less risk of harm. Third are products which, though not per se, are still unreasonably dangerous because there was a feasible way to design the product with less harmful consequences. In cases based on alleged alternative products or designs, the manufacturer is held to the standard of an expert and may introduce evidence as to whether it could know of and feasibly avoid the danger. Halphen, supra at 115.
Berry urges that reversible error occurred because Wen was allowed to introduce evidence bearing on its own knowledge and the feasibility of an alternative design. A plain reading of Halphen shows this position is incorrect. Evidence as to the state of the art defense is inadmissible when the case is based on a design that is unreasonably dangerous per se, but this is manifestly not the situation in the instant case. The evidence overwhelmingly shows that this saw in its basic design is much more useful than the danger it poses. Only one witness suggested that all portable circular saws were defective for some reason or other; this falls far short of proving the Model 960 is unreasonably dangerous per se. At oral argument counsel for Berry conceded the case is based on alleged alternative designs or alternative products; evidence was admissible to show what Wen, as an expert, should have known, and whether the alternative design or product was feasible. This portion of Berry's argument lacks merit.
The second phase of Berry's argument contests allegedly erroneous jury instructions. Aside from the state of the art defense, the jury instructions tracked LPLA. LPLA represented a major overhaul in the rules of Halphen. See Kennedy, "A Primer on the Louisiana Products Liability Act," 49 La.L.Rev. 565 (1989). It eliminated the class of "unreasonably dangerous per se" and confined recovery to four specific causes of action. R.S. 9:2800.54 *492 B. It retained the class of "unreasonably dangerous in design" as well as the state of the art defense. R.S. 9:2800.56,.59. It defined the elements of the cause of action as follows:
§ 2800.56. Unreasonably dangerous in design
A product is unreasonably dangerous in design if, at the time the product left its manufacturer's control:
(1) There existed an alternative design for the product that was capable of preventing the claimant's damage; and
(2) The likelihood that the product's design would cause the claimant's damage and the gravity of that damage outweighed the burden on the manufacturer of adopting such alternative design and the adverse effect, if any, of such alternative design on the utility of the product. An adequate warning about a product shall be considered in evaluating the likelihood of damage when the manufacturer has used reasonable care to provide the adequate warning to users and handlers of the product. (emphasis added)
The underscored language shows that under LPLA, a claimant must show that the alternative design (which is also feasible and would avert the injury) withstands a risk/utility analysis. The risk/utility analysis was not required under Halphen. See Kennedy, "Primer," supra at 607; Crawford, "Developments in the Law, 1985-1986: Torts," 47 La.L.Rev. 485 (1986). It was error for the jury to consider that even though an alternative design was feasible and would have prevented the harm, the product is not defective because the likelihood and gravity of harm from the unimproved product did not outweigh the burden of incorporating the alternative design and the adverse effect of that design on the product's utility. The instant jury charge includes precisely this instruction. R. p. 1454. This phase of Berry's argument has merit.
Ordinarily a trial court judgment may not be reversed on appeal unless the reviewing court determines, after thorough review, that the trier's findings are manifestly erroneous. Rosell v. Esco, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). When, however, the trial court makes a consequential but erroneous ruling, such as giving an incorrect jury charge, the appellate court should usually disregard the judgment and review the evidence de novo to render a proper judgment. Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975), and citations therein; Fuller v. USAIG, 530 So.2d 1282 (La.App. 2d Cir.1988), writ denied 534 So.2d 444 (La. 1988), cert. denied ___ U.S. ___, 109 S.Ct. 1954, 104 L.Ed.2d 424 (La.1989), and citations therein. In the instant case, the trial court applied the wrong law and gave an incorrect jury charge. We have therefore followed the admonition of Gonzales and Fuller to review the evidence in the posture of a factfinder.

The Wen Model 960 circular saw
In presenting his case, Berry sought to show that the Wen Model 960 was unreasonably dangerous in design because it lacked an protective device to prevent inadvertent activation; that designs for various safety devices were available and feasibly could have been incorporated when the saw was made; and any of these safety devices would have prevented his injury. Wen argued that alternative designs were not contemplated by the industry at the time and were not feasible; and the saw was safe because it was designed with a "pretravel" switch and, most importantly, a protective lower blade guard which would have averted this accident. In reviewing the testimony, we have also focused on the issues of normal use and causation.
Mr. Nicholas Anton, Wen's founder and president, and Mr. Spencer Rees, Wen's vice-president of engineering (formerly director of engineering), gave the history and background of the Model 960. When Mr. Anton first decided to make a portable circular saw, he examined the other saws on the market with an eye toward adopting the best features of the lot. Mr. Anton's finished product was so similar to the Black and Decker saw that Black and Decker asserted a patent infringement.
*493 Mr. Anton insisted that safety was a paramount concern. He complied with, even relied upon, Underwriter's Laboratories (UL) standards which, at the time, did not mandate stricter safety. No one in the industry was using a trigger guard or lockoff switch (similar to the safety in use on firearms for over 30 years) on portable circular saws at the time. Rather, Model 960 had a pretravel switch that had to be pressed a certain distance in order to start the motor; this should prevent inadvertent activation. Mr. Anton also said that in the mid-1960s neither Wen, Black and Decker, nor anyone else in the industry made their own switches; they bought them from switch manufacturers who did not make lockoffs for this tool at the time (the saw that Berry was using was made between January 1966 and June 1968). Mr. Rees asserted that technology for alternative switches for portable circular saws "did not exist" at the time, even though guns and other types of tools used them. For Wen to have designed, developed and manufactured such a switch on its own would have been prohibitively expensive.
Mr. Rees testified that in 1977, UL tightened safety standards to require either a safety lockoff or a pretravel of at least ¼". Initially Wen adopted the lockoff, which was not expensive, but users were either disarming it by tampering with the wiring or complaining about its inconvenience. Ultimately Wen returned to a pretravel device.
Both Mr. Anton and Mr. Rees testified that the lower blade guard was an important safety device. It covers the exposed lower blade, is displaced by the workpiece during the cutting process, and quickly slides back to a protective position when the saw is withdrawn from the workpiece. Mr. Rees admitted that in the absence of the blade guard, a lockoff switch probably would have prevented Berry's accident. Both witnesses felt that Model 960, because of the safety pretravel switch and the lower blade guard, was not unreasonably dangerous for normal use.
The plaintiff called two experts. The first was Dr. Vaughn Adams Jr., a consulting engineer who specializes in safety engineering. He described a dual action trigger or lockoff as a device that would require two separate acts to energize the saw; it is a good safety device for this reason. He also described a trigger guard to cover the trigger and provide a place to rest the fingers while the saw was being carried; it is a good safety device because the user could not start the saw until he intentionally moved his finger off the guard. The technology for these devices existed in the mid-1960s, but he never saw any manufacturer use a dual action switch on a portable circular saw until 1972. He nevertheless felt that Model 960 posed a foreseeable risk of inadvertent activation because it lacked these devices. In fact, the weight of the saw carried in the normal position was enough to activate it.
Dr. Adams discussed the value of the lower blade guard as a safety device. He conceded that if this guard had been in place, the accident may not have occurred; however, even without the blade guard, a dual action switch would have made the accident "extremely improbable."
Dr. Adams finally explained that mere compliance with UL standards does not assure safety; these represent an industry consensus or minimum standard. Even though it met UL standards, he felt the Model 960 was unreasonably dangerous in normal use because it lacked a dual action switch or trigger guard. He also felt that Berry's fault, as well as Gene Barton's, were contributing factors in the accident.
The plaintiff's other expert was Mr. Stanley Kalin, a safety engineer and non-practicing attorney from Maryland. He had recently published an article, "Portable Circular Saws: Usefulbut Dangerous Tools," in Trial, November 1986, p. 61. He described his five-step procedure for assessing the utility and risk of a product. He concluded that the Model 960 was unreasonably dangerous in its normal and intended use because it lacked a trigger lock which would require two separate acts to energize the blade. In fact, the easiest way to lift and carry the Model 960 was to place the finger right on the trigger; this *494 practically invited inadvertent activation. A lockoff would add very little cost to the saw, and the technology for it existed in the mid-1960s. Over defense objection, he offered copies of patents issued in 1964 and 1965 for a "trigger switch with lock" and "trigger locking means" for portable tools or appliances. Mr. Kalin felt it was a breach of Wen's duty not to find these patents and incorporate them into the saw.
Discussing the lower blade guard, Mr. Kalin acknowledged that had it been in place, the injury "most likely" would not have occurred. He felt that removal or malfunction of the guard was foreseeable, or perhaps only "conceivable"; and a trigger lockoff would have prevented Berry's injury even if the guard was missing. The modern Sears Craftsman model has both devices. Mr. Kalin also stated, however, that the absence of the blade guard was obvious and that no one should use an unguarded saw.
Like Dr. Adams, Mr. Kalin dismissed UL standards as minimal and inadequate to assure safety. He admitted that portable circular saws are useful tools, but stated that every one on the market lacks certain safety devices; the Model 960 was unreasonably dangerous for its intended use. He conceded that Berry's actions in climbing an unsecured ladder and holding the saw in his left hand also contributed to the accident.
The defense called Mr. Craig Bertolett, an expert mechanical engineer who once managed a Black and Decker plant that made portable circular saws. He was also tendered but not accepted as an accident reconstruction expert. He had examined, at Wen's lab, the saw that Berry was using. He confirmed that the lower blade guard was broken off; the unit, in fact, was in generally poor condition. It had a pretravel switch that had to be pressed about 3/16"' before the blade would start. Black and Decker used a similar device in the mid-1960s; no manufacturer used dual action switches then, and he was not aware that any switch maker produced them until about 1972. Like Wen, Black and Decker had experimented with dual action triggers when UL tightened the standards, but rejected them in favor of a 1/4" pretravel switch, which users seemed not to circumvent.
Mr. Bertolett discussed the patents that Mr. Kalin had brought to trial. A patent, he explained, has nothing to do with technology available in the actual industry. These particular patents did not equate to dual action switches on a portable circular saw; they were actually intended to stop accidental battery depletion in the tool chest. He admitted it was scientifically possible to put a dual action switch on the Model 960 in 1966 without excessive cost, but from the engineering standpoint this was only "perhaps" possible.
Mr. Bertolett felt that Model 960's design showed adequate regard for safety; when equipped with the lower blade guard, which would shield the blade within .11 seconds after it left the workpiece, this saw was not unreasonably dangerous for its intended use. With the blade guard in place, he felt this accident would not have happened.

Normal use and causation
As noted above, the plaintiff who would prevail in a products liability case under Halphen must prove both that the product had, when it left the manufacturer's control, a defect that made it unreasonably dangerous to normal use and that the defect caused the injury. The manufacturer can escape liability only by showing that the injury was caused by the fault of the victim, of a third person, or by an irresistable force. Halphen, supra at 116; Nevils v. Singer Co., 533 So.2d 157 (La.App. 5th Cir.1988). The theory of liability based on alternative products or alternative design does not avail a plaintiff who fails to prove initially that the alleged design defect was the cause in fact of the injury.
The initial question of normal use usually arises in cases alleging a failure to warn. See, e.g., Bloxom v. Bloxom, 512 So.2d 839 (La.1987); Whitacre v. Halo Optical Products Inc., 501 So.2d 994 (La.App. 2d Cir.1987). Normal use encompasses not just use precisely in accordance with the manufacturer's instructions; it includes all *495 reasonably foreseeable uses and misuses of a product. Bloxom v. Bloxom, supra; Savoie v. Deere & Co., 528 So.2d 724 (La.App. 1st Cir.1988), writ denied 532 So.2d 177 (La.1988). When the victim or a third party engages in conduct that ignores or disregards an obvious or well-known danger, this conduct is not normal use. Whitacre v. Halo Optical Products, supra; Savoie v. Deere & Co., supra; Scott v. Terrebonne Lumber Co., 479 So.2d 410 (La.App. 1st Cir.1985), writ denied 485 So.2d 61 (La. 1986). While the manufacturer must provide a reasonably safe product, he does not insure against conduct not in normal use.
When it left the manufacturer, the Model 960 circular saw was equipped with a lower blade guard, its primary safety device (see Nevils v. Singer, supra at 159) and a pretravel switch. Our de novo review of the evidence convinces us the saw was not unreasonably dangerous to normal use in its original condition. The evidence does show, however, that without the blade guard it posed an obvious danger to its user.
We have closely examined the record to find the source of the harm. Admittedly, Gene Barton did not maintain the saw in good condition; it was dirty, full of sawdust and had a broken clutch, among other problems. These deficiencies can be called reasonably foreseeable. However, the evidence preponderates to show that Gene Barton subjected the saw to abnormal use by removing and not replacing a broken blade guard and then bringing the unguarded saw to the workplace. This contravened a specific instruction in the owner's manual, created an obvious danger and exposed others to the danger. We find that Gene Barton's conduct was a contributing cause of this accident.
The evidence further preponderates to show that Berry himself subjected the saw to abnormal use. He either ignored Gene Barton's warning that the guard was missing, or failed to look and see this obvious condition of a saw lying right in front of him. He picked up the saw in his subordinate (left) hand and climbed an unsecured ladder. He was familiar with circular saws and presumably understood the risk of being cut by an exposed blade; cutting is, after all, the function of the tool. He had once read an owner's manual and there was evidence that he was cautioned about the saw at the scene. We conclude that Berry's own conduct was a contributing cause of the accident.
On the other hand, the evidence does not show, more probably than not, that Wen should have anticipated that Gene Barton would fail to correct an obvious breakage, carry an unguarded saw to the workplace and offer it for use; or that Berry would overlook or ignore an obvious danger and handle the saw in a manner inconsistent with normal use. The acts of Gene Barton and of Berry were simply not reasonably foreseeable, and they were the cause of this accident.
Our review of the testimony as to causation verifies that conduct other than Wen's caused the accident. Virtually everyone thought that removal of the blade guard, and use of the saw in the face of this obvious danger, was the real cause. Experts Bertolett and Kalin, as well as Berry himself, testified that with the blade guard in place there would have been no accident. Dr. Adams, who was less familiar with the facts of the accident, at least conceded this as a possibility. Mr. Kalin added that no one should use an unguarded saw. It is clear that if the saw had not been subjected to the abnormal use described above, Berry would not have suffered harm; the abnormal use was the cause of the accident.
In light of all these facts, we find the plaintiff has not proved by a preponderance of evidence that any condition of the Wen Model 960 circular saw made it unreasonably dangerous to normal use or that any condition of the saw caused his injury. The proper judgment is to reject the claims against Wen. We therefore affirm the judgment of the trial court, not as a matter of manifest error but because of our independent assessment of the facts. The other issues raised by this appeal are not considered.
*496 The judgment of the trial court is affirmed at plaintiff's costs.
AFFIRMED.

APPLICATION FOR REHEARING
Before HALL, NORRIS, LINDSAY, MARVIN and SEXTON, JJ.
Rehearing denied.